955 A.2d 843

**Tammie A. PULLIAM, Personal Representative of the Estate of Rodney B. Pulliam, et al.**

v.

**MOTOR VEHICLE ADMINISTRATION, et al.**

**No. 1987 Sept. Term, 2006.**

Court of Special Appeals of Maryland.

Sept. 4, 2008.

146

148

Stephen D. Annand (Alison J. McGriff, Cochran Firm on the brief), Washington, D.C., for appellant.

Leight D. Collins (Dore J. Lebowitz, Glen Burnie Douglas, F. Gansler, Attorney General on the brief), of Baltimore, for appellee.

Argued before SALMON, DEBORAH S. EYLER, and RAYMOND G. THIEME, JR., (Ret., specially assigned), JJ.

THIEME, J.

This case arises out of a March 23, 2002 automobile collision in which Anthony F. Grimes struck and killed Rodney B. Pulliam and his three children, Rodney B. Pulliam, II, Matthew I. Pulliam, and Jordan Pulliam. Tammie A. Pulliam, appellant, is the surviving spouse of Rodney B. Pulliam and the natural mother of Rodney, Matthew, and Jordan. On October 17, 2002, appellant, as personal representative of the estate of Rodney B. Pulliam, and next of kin to the deceased members of the Pulliam family, filed suit in the Circuit Court

for Frederick County against Grimes. She later filed an amended complaint adding the Motor Vehicle Administration ("MVA") and the Motor Vehicle Administration's Medical Advisory Board ("MAB"), appellees, as defendants.

Appellees filed a motion to dismiss the amended complaint for failure to state a claim upon which relief can be granted, which the court granted. On September 29, 2006, appellant settled her claims against Grimes, and this appeal followed.

## Issue Presented

Appellant presents three questions for our consideration, all of which involve the single issue of whether the circuit court erred in dismissing her claims against the MVA and the MAB.[1]

## Factual Background

The facts, as set forth in appellant's amended complaint, are as follows: The MVA is a state agency responsible for licensing and enforcement of regulations regarding operators of motor vehicles, and has the responsibility of ensuring that drivers are capable of operating motor vehicles safely. The MVA performs these functions in a variety of ways, including referral to the MAB, which is a group within the MVA that is required to review and approve the reinstatement, suspension, and/or revocation of driving privileges for persons with epilepsy and other illnesses in which there is a lapse of consciousness, blackout, seizure, and other conditions.

On or about November 11, 2000, Grimes suffered a seizure while driving, and struck a house with his car. As a result of that incident, the MAB issued an emergency suspension of his

---

1. Appellant presented the following questions for our consideration:
 1. At the motion to dismiss stage and taking all factual allegations as true, do Appellants allege facts to state a claim against the [MVA and the MAB]?
 2. Did the trial court err as a matter of law by dismissing Appellants' claims prior to discovery of the [MVA and the MAB]?
 3. Is the public duty doctrine consistent with Maryland public policy?

driving privileges, and later recommended a three (3) month "driving/license suspension." On February 12, 2001, the MAB suspended Grimes' driving privileges. On or about April 20, 2001, the MAB withdrew the suspension of Grimes' driving privileges, but required him to submit every three (3) months, beginning on July 20, 2001, an affidavit certifying that he was seizure free. Grimes was also required to submit, on April 20, 2002, a follow-up report from his treating physician.

On July 10, 2001, Grimes submitted an incomplete affidavit, failing to certify that he was seizure free. On October 11, 2001, Grimes advised his physician, Konrad Bakker, M.D., that he had turned in his license after having had another seizure and causing "a fender bender." Between that date and February 16, 2002, Grimes failed to file an affidavit stating that he had been seizure free for 90 days as required by the MAB. Nevertheless, on or about February 16, 2002, Grimes applied for, and was issued, a duplicate driver's license.

Just over a month later, on March 23, 2002, Grimes had one or more seizures, but continued to operate a motor vehicle. At approximately 10:34 that morning, while traveling southbound in the right lane of Butterfly Lane near its intersection with Jefferson Pike, Grimes drove his vehicle into the back of a vehicle operated by Rodney B. Pulliam, causing the death of Mr. Pulliam and his three children, who were passengers in the vehicle.

Appellant claimed that the MVA and the MAB were on notice that Grimes was an impaired driver because of his history of seizures and motor vehicle accidents, and that they each had a duty to monitor the certification of such drivers and to protect residents from harm on Maryland roadways by verifying that Grimes was capable of safely operating a motor vehicle. According to appellant, the MVA and MAB each owed a duty to her and her deceased family members to exercise the degree of skill and care expected of a reasonably competent agency in the same or similar circumstances.

Appellant's amended complaint included survival actions for Rodney B. Pulliam and each of the three Pulliam children.

Appellant claimed that Grimes was negligent in failing to maintain a reasonable and proper rate of speed; failing to maintain proper control of his vehicle; failing to keep a proper lookout; failing to operate his vehicle in a safe and reasonable manner; carelessly, recklessly and negligently operating his vehicle while under a known physical impairment; and, failing to take steps necessary to avoid the collision.

Appellant further alleged that the MVA negligently beached its duty to ensure that Grimes was capable of operating a motor vehicle safely and to enforce regulations regarding motor vehicle operators with disabilities by failing to maintain current records documenting Grimes' seizure control; failing to investigate the circumstances regarding Grimes' surrender of his motor vehicle license; failing to prevent Grimes from obtaining a motor vehicle license without the required documentation demonstrating that he was seizure free for the requisite time period; and, failing to take steps necessary to avoid an unsafe driver from operating a motor vehicle.

As to the MAB, appellant alleged that it breached its duty to review and make prudent decisions regarding proposed reinstatements, suspensions and/or revocations of driving privileges for persons with epilepsy or other illnesses in which there is a lapse of consciousness, blackout, or seizure; by failing to maintain current records documenting Grimes' seizure control; failing to investigate the circumstances regarding Grimes' surrender of his motor vehicle license; failing to prevent Grimes from obtaining a motor vehicle license without the required documentation demonstrating that he was seizure free for the requisite time period; and, failing to take steps necessary to avoid an unsafe driver from operating a motor vehicle.

Appellant also asserted wrongful death claims alleging that, as a result of Grimes' negligence, her husband and three children suffered grave personal injuries, resulting in death, causing pecuniary loss to the estate and next of kin, and causing appellant to suffer mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection,

care, attention, advice, counsel and guidance, as well as other economic and non-economic damages and related losses.

In response to appellant's amended complaint, the MVA and the MAB filed a motion to dismiss for failure to state a claim upon which relief could be granted on the ground that no duty of care was owed to appellant's deceased husband or sons. They claimed that appellant's cause of action fell within the general tort law that no person has the duty to protect a plaintiff from the negligent or intentional acts of third persons, and that the duty of a state agency to act as mandated by statute for the protection of the public health and safety is owed to the public at large and does not create a tort duty to an individual.

In addition, the MVA and MAB argued that even if the MVA had owed a duty in tort to the deceased members of the Pulliam family to take action against Grimes' driving privilege, the MVA was prevented from taking any action to suspend Grimes' driver's license because the maximum period of license suspension that could have been imposed upon report of a seizure was 90 days. According to appellees, even if Grimes' voluntary relinquishment of his driver's license on October 11, 2001 provided notice that he had had a subsequent seizure, the most appellees could have done was impose another 90–day suspension, which would have made Grimes eligible to seek reissuance of his driver's license prior to the date of the subject automobile accident.

Appellant countered that the MVA had the legal authority to restrict, suspend or revoke Grimes' driver's license, but negligently failed to do so by failing either to suspend Grimes' license at the time he requested a duplicate license or denying his request for a duplicate license.

The court rejected appellees' argument that the MVA was prevented from taking any action to suspend Grimes' driver's license because the maximum period of suspension that could have been imposed was 90 days, but granted the motion to dismiss with prejudice on the ground that the duties owed by

the MVA and MAB are owed to the public at large and do not create an enforceable tort duty to specific individuals.

## Standard of Review

We review the grant of a motion to dismiss *de novo*. *Reichs Ford Road Joint Venture v. State Roads Com'n of the State Highway Admin.*, 388 Md. 500, 509, 880 A.2d 307 (2005)(citing *Adamson v. Corr. Med. Servs.*, 359 Md. 238, 246, 753 A.2d 501 (2000)). We examine the complaint and determine whether it states a legally sufficient cause of action. *Id.; Collins v. Li*, 176 Md.App. 502, 534–35, 933 A.2d 528 (2007). We must assume the truth of all the well-pleaded factual allegations of the complaint, including the reasonable inferences that may be drawn from them, and we review the complaint in the light most favorable to the non-moving party. *Debbas v. Nelson*, 389 Md. 364, 372, 885 A.2d 802 (2005); *Reichs Ford*, 388 Md. at 509, 880 A.2d 307; *Collins*, 176 Md.App. at 534–35, 933 A.2d 528. Dismissal is proper only if the complaint would fail to provide the plaintiff with a judicial remedy. *Allied Inv. Corp. v. Jasen*, 354 Md. 547, 555, 731 A.2d 957 (1999); *Reichs Ford*, 388 Md. at 509, 880 A.2d 307 (citing *Bobo v. State*, 346 Md. 706, 709, 697 A.2d 1371 (1997)).

## Discussion

### A. Duty

It is well established that in order to set forth a claim for negligence, a plaintiff must allege the following elements: a duty owed by the defendant to the plaintiff, a breach of that duty, actual injury or loss suffered by the plaintiff, and that the injury or loss proximately resulted from the defendant's breach of the duty. *Muthukumarana v. Montgomery County*, 370 Md. 447, 486, 805 A.2d 372 (2002)(and cases cited therein); *Corinaldi v. Columbia Courtyard, Inc.*, 162 Md.App. 207, 218, 873 A.2d 483 (and cases cited therein), *cert. dismissed*, 389 Md. 124, 883 A.2d 914 (2005).[2] Whether

---

2. Historically, the State of Maryland enjoyed immunity from tort liability for the acts of its employees but, by the enactment of the Maryland

there is adequate proof of the required elements to succeed in a negligence action is generally a question of fact to be determined by the fact-finder, while the existence of a legal duty is a question of law to be decided by the court. *Patton v. United State of America Rugby Football Union, Ltd. d/b/a USA Rugby, et al.,* 381 Md. 627, 636, 851 A.2d 566 (2004); *Corinaldi,* 162 Md.App. at 218, 873 A.2d 483.

The focus in this case is on the first element, duty, which the Court of Appeals has defined as follows:

> "Duty" in negligence has been defined as "an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." *Prosser and Keeton, supra,* § 53. There is no set formula for this determination. As Dean Prosser noted, "duty is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." *Id.* In broad terms, these policies include: "convenience of administration, capacity of the parties to bear the loss, a policy of preventing future injuries, [and] the moral blame attached to the wrongdoer...." *Id.* As one court suggested, there are a number of variables to be considered in determining if a duty exists to another, such as:

> the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered the injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved.

Tort Claims Act, Md.Code Ann., State Gov't § 12–101 *et seq.,* the State, through a limited waiver of sovereign or governmental immunity, provides a remedy for citizens injured by the negligent acts or omissions of state personnel acting within the scope of their public duties.

*Tarasoff v. Regents of University of California,* 17 Cal.3d 425, 434, 131 Cal.Rptr. 14, 22, 551 P.2d 334, 342 (1976).

*Ashburn v. Anne Arundel County,* 306 Md. 617, 627, 510 A.2d 1078 (1986).

"While foreseeability is often considered among the most important of these factors, its existence alone does not suffice to establish a duty under Maryland law." *Remsburg v. Montgomery,* 376 Md. 568, 583, 831 A.2d 18 (2003). Maryland courts, like those in most jurisdictions, have held that "there is no duty to control a third person's conduct so as to prevent personal harm to another, unless a 'special relationship' exists either between the actor and the third person or between the actor and the person injured." *Ashburn,* 306 Md. at 628, 510 A.2d 1078. *See also Scott v. Watson,* 278 Md. 160, 166, 359 A.2d 548 (1976)("a private person is under no special duty to protect another from criminal acts by a third person, in the absence of statutes, or of a special relationship"). A special duty to protect another from the acts of a third party may be established " '(1) by statute or rule; (2) by contractual or other private relationship; or (3) indirectly or impliedly by virtue of the relationship between the tortfeasor and a third party.' " *Remsburg,* 376 Md. at 583–84, 831 A.2d 18 (quoting *Bobo v. State,* 346 Md. 706, 715, 697 A.2d 1371 (1997)(internal citations omitted)).

The case before us does not involve any allegation of a contractual or other private relationship between appellant and any other party, so we need not consider that method of establishing a tort duty herein. As to the other two methods of establishing a special duty, the Court of Appeals discussed the required analysis in *Remsburg.* In that case, the Court considered whether Maryland statutes or regulations regarding hunting created a duty in tort upon the leader of a hunting expedition, James Remsburg Sr., to protect Charles and Brian Montgomery who were accidentally shot and wounded by Remsburg's son, James Remsburg, Jr., a 27 year old emancipated adult who was a member of the hunting expedition. The Court recognized that in determining whether a statute or

regulation gives rise to a special duty, a two part test is required:

> Evidence of negligence may be established by the breach of a statutory duty "when the plaintiff is a member of the class of persons the statute was designed to protect and the injury was of the type the statute was designed to prevent." *Erie Ins. Co. v. Chops*, 322 Md. 79, 84, 585 A.2d 232, 234 (1991)(citing *Pahanish v. Western Trails, Inc.*, 69 Md.App. 342, 362, 517 A.2d 1122 (1986)); *see also Geo. Byers Sons, Inc. v. East Europe Import Export, Inc.*, 463 F.Supp. 135, 138 (D.Md.1979)("To use a statutory duty as a foundation for a negligence claim, the plaintiff must show that it was within the class of persons the legislation was intended to protect and that the alleged injury was of the type of harm which the statute was intended to prevent"). Furthermore, the statute must "set forth mandatory acts clearly for the protection of a *particular class* of persons rather than the public as a whole." *Ashburn*, 306 Md. at 635, 510 A.2d at 1087 (quoting *Morgan v. District of Columbia*, 468 A.2d 1306, 1314 (D.C.1983)) (citations omitted).

*Remsburg*, 376 Md. at 584, 831 A.2d 18.

In determining whether a duty is created by virtue of a special relationship between the parties, the Court stated:

> [A] "special relationship" between the parties can be established by either (1) the inherent nature of the relationship between the parties; or (2) by one party undertaking to protect or assist the other party, and thus often inducing reliance upon the conduct of the acting party.

*Id.* at 589–90, 831 A.2d 18.

Examples of special relations giving rise to a duty to aid or protect are set forth in § 314A of the Restatement (Second) of Torts ("Restatement"), which provides:

> (1) A common carrier is under a duty to its passengers to take reasonable action
>
> (a) to protect them against unreasonable risk of physical harm . . . .
>
> (2) An innkeeper is under a similar duty to his guests.

(3) A possessor of land who holds it open to the public is under a similar duty to members of the public who enter in response to his invitation.

(4) One who is required by law to take or who voluntarily takes the custody of another under circumstance such as to deprive the other of his normal opportunities for protection is under a similar duty to the other.

*See id.* at 593, 831 A.2d 18 (and cases cited therein). Although the foregoing list is not exhaustive, and some flexibility in defining this limited exception has been permitted, the Court has "been careful not to expand this class of 'special relationships' in such a manner as to impose broad liability for every group outing." *Id.* at 594, 831 A.2d 18.

On a number of occasions, Maryland courts have considered these issues in cases raising the question of what duty, if any, is owed by a governmental entity to an individual. In *Lamb v. Hopkins*, 303 Md. 236, 492 A.2d 1297 (1985), a probation officer failed to report two of a probationer's convictions to the circuit court. Subsequently, while driving under the influence of alcohol, the probationer collided with a vehicle operated by Cynthia Lamb, rendering Lamb's then five-month-old daughter a quadriplegic. The Court of Appeals concluded that the probation officer's statutory duty to report a probationer's violations is owed to the court and does not extend to the general public, including the Lambs.

In reaching that conclusion, the Court examined § § 315 and 319 of the Restatement. The Court recognized that § 315, which reflects the common law of Maryland, "outlines the appropriate analytical framework for determining whether an actor has a duty to control a third person." Section 315 provides:

There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

(b) a special relation exists between the actor and the other which gives to the other a right to protection.

In *Lamb*, the Court also adopted § 319 as the law of Maryland governing the duty of those in charge of persons having dangerous propensities. Section 319 provides:

One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

The Court of Appeals specifically referred to the comment to § 319, which indicates that the section applies in two situations:

First, § 319 applies to those situations where the actor has charge of one or more of a class of persons to whom the tendency to act injuriously is normal. Second, § 319 applies to those situations where the actor has charge of a third person who does not belong to such a class but who has a peculiar tendency so to act of which the actor from personal experience or otherwise knows or should know.

*Lamb*, 303 Md. at 243, 492 A.2d 1297.

Based on these two sections of the Restatement, the *Lamb* Court concluded that the probation officers did not meet the threshold requirement of taking charge of the probationer nor did they direct his activities as required by § 319. *Id.* at 246, 492 A.2d 1297. The court also concluded that the duties owed by the probation officers were owed to the Court and did not extend to the general public, including the Lambs. *Id.* at 251–52, 492 A.2d 1297.

Finally, the Court rejected the Lambs' contention that the duty of the probation officers under § 319 is owed to " 'anyone, readily identifiable or not, who, as a result of the failure to exercise due care in controlling the person, is foreseeably harmed by that person.' " *Id.* at 253, 492 A.2d 1297. The Court concluded that before a court can determine to whom a duty is owed, it must first determine that a duty exists. Since the Court determined that the probation officers were under

no duty to control the probationer because they had not taken charge of him under § 319, it was unnecessary to determine to whom a § 319 duty is owed or to reach the issue of proximate causation. *Id.*

In *Ashburn,* 306 Md. at 620, 510 A.2d 1078, the Court of Appeals considered whether a police officer may be held liable to a person injured by a drunk driver when the officer noticed the driver's intoxication, but failed to stop and detain the driver before he drove away and collided with Ashburn. Relying in part on *Lamb* and § 315 of the Restatement, the Court recognized that in order for a special relationship to be found, the plaintiff must show "that the local government or the police officer affirmatively acted to protect the specific victim or a specific group of individuals like the victim, thereby inducing the victim's specific reliance upon the police protection." 306 Md. at 631, 510 A.2d 1078 (and cases cited therein).

The Court concluded that there was no special relationship between Ashburn and the police officer, and also rejected Ashburn's contention that § 16–205.1(b)(2) of the Transportation Article, which set forth procedures for a police officer who stops or detains a driver believed to be intoxicated, evidenced the intent of the Legislature to impose civil liability upon a police officer who fails to comply with the section. *Id.* at 634, 510 A.2d 1078. The Court held that in order for a statute to impose a special relationship between a police officer and a victim, and thereby create a duty in tort, the statute "must set forth mandatory acts clearly for the protection of a *particular class* of persons rather than the public as a whole." *Id.* (citations and internal quotations omitted).

A similar issue was addressed in *Willow Tree Learning Center v. Prince George's County,* 85 Md.App. 508, 584 A.2d 157 (1991), where we held that neither the State nor a county "owes any individual duty of care merely by the enactment of a general ordinance requiring safety inspections, nor by the fact that it undertook inspections for safety violations." *Id.* at 515, 584 A.2d 157. In that case, five-year-old Brian Sanders was fatally injured while using playground equipment on the

premises of the Willow Tree Learning Center ("Willow Tree"), a private daycare center. Brian's parents filed a negligence action against Willow Tree which, in turn, sought contribution and/or indemnification from Evelyn Hoban, a county employee who had inspected the play equipment, and Prince George's County, Hoban's employer. The Sanders settled with Willow Tree.

Hoban and Prince George's County filed motions to dismiss, or in the alternative, for summary judgment, which the trial court granted on the grounds that Hoban's inspection of Willow Tree was a governmental function arising out of the exercise of the Prince George's County's police powers; that the inspection did not create a legal duty to the owner, operator, or user of the inspected premises; and there were no statutory provisions creating such a duty. *Id.* at 511, 584 A.2d 157.

In affirming the circuit court's grant of summary judgment, we rejected the argument that applicable safety regulations contained in the Maryland Code, COMAR, and the Prince George's County Code, created a duty on the part of Hoban and the County to the Sanders. Relying, in part, on *Lamb,* we held that "[t]he duty created by the statute and ordinance was one owed to the public generally." *Willow Tree,* 85 Md.App. at 515, 584 A.2d 157. We also noted that there was "a complete lack of any intention on the part of the Legislature which would indicate that it was creating a duty to individual members of the public," and we declined to create one ourselves. *Id.* at 516, 584 A.2d 157.

In addition, we rejected the Sanders' assertion that a special relationship was created between them and the County (1) by the County's action in licensing, regulating, and inspecting the day care center to ensure the safety of children using the playground, (2) by the enactment of the statute mandating inspections, and (3) by the County's adoption of an inspection program through which it voluntarily assumed a special relationship with the children attending the daycare center. We rejected these arguments, holding:

We do not believe that a special relationship, creating a tortious duty, is created by a governmental decision to legislate safety programs in a particular industry, unless that duty is expressly created by the statute. This is in accord with the majority of the cases we have reviewed from other jurisdictions. As far as we can discern, there are no Maryland cases to the contrary. We hold that no special relationship existed between Willow Tree and the County.

\* \* \*

In sum, virtually every citizen or visitor to this State has contact on a daily basis with an entity that is subject to governmental health and safety inspections. To hold that the inspection in the case *sub judice* creates special relationships and duties giving rise to the right to sue the County might well extend far beyond the specific ramifications of the case at bar.

We perceive a clarity of legislative purpose from the profusion of regulation and inspection provisions that the legislature has created. That purpose, as often stated in the statutory provisions themselves, is to insure the health and safety of the people of Maryland. A proliferation of suits and judgments resulting therefrom against the State and/or local governments based upon duties or special relationships, perceived by the litigants to have been created to run to them personally, as opposed to the public generally, might well cause the legislative branch to pause and reconsider the feasibility of continuing this type of regulatory activity. Any cessation or suspension of the Legislature's willingness to protect its citizens, we believe, would be disproportionately injurious to the public in general. The creation of causes of action arising out of statutory schemes of regulations and inspections is a matter of policy and should be addressed, if at all, by the Legislature. It is not the function of the judiciary to make policy of this type. Absent an explicit statement in a statute creating that type of duty, we do not believe that courts should draft them into a statute by implication. We hold, specifically in reference

to the present statute, that no such duty nor special relationship expressly or impliedly exists. There being no duty, there can be no breach of duty and thus no actionable negligence.

*Id.* at 519–22, 584 A.2d 157.

In *Muthukumarana v. Montgomery County,* 370 Md. 447, 805 A.2d 372 (2002), the Court of Appeals again considered whether certain local government employees owed an individual tort duty to persons in need of their services and when those employees may be held liable for their negligent performance of that duty. *Muthukumarana* involved two cases which the Court of Appeals consolidated.[3] One involved a negligence claim brought against a police dispatcher and the chief of Harford County's emergency management and operations division by the mother of a minor who died from hypothermia after certain persons at a party placed the unconscious minor outside the residence where the party was being held. The mother alleged that the dispatcher transmitted inaccurate information about the minor's location after receiving an anonymous call. The other case involved a claim against a 911 operator brought by a mother whose children were fatally shot by her husband while she was on the telephone with the 911 operator reporting a domestic violence incident.

As to both cases, the Court of Appeals concluded that "911 operators and dispatchers have duties or responsibilities commensurate with those of police officers," and, therefore, "it is appropriate to measure their negligence liability, as well as the liability of their managers and supervisors, by the same standard applied to the police officers who respond to their dispatches." *Muthukumarana,* 370 Md. at 489–90, 805 A.2d 372 (internal quotations omitted).

The Court discussed the duty to aid as follows:

---

3. The cases consolidated were *Fried v. Archer,* No. 84, September Term 2001 and *Muthukumarana v. Montgomery County,* No. 83, September Term 2001.

In previous cases, we have defined the scope of the tort duty owed by police officers to persons in need of assistance by applying the 'public duty doctrine.' Generally, under the public duty doctrine, when a statute or common law "imposes upon a public entity a duty to the public at large, and not a duty to a particular class of individuals, the duty is not one enforceable in tort." DAN B. DOBBS, THE LAW OF TORTS § 271 (2000)(footnote omitted). As we explained in *Ashburn [v. Anne Arundel County,* 306 Md. 617, 510 A.2d 1078 (1986)], the "duty owed by the police by virtue of their positions as officers is a duty to protect the public." *Ashburn,* 306 Md. at 628, 510 A.2d at 1084. Pursuant to the doctrine, therefore, police officers ordinarily may not be held liable for failure to protect specific persons because they owe no duty, as the first element of a negligence action requires, to those individuals.

The public duty doctrine, however, is not without its limitations. Specifically, it "has no application when the court concludes that a statute or court order has created a *special duty* or specific obligation to a particular class of persons rather than to the public at large." DOBBS, *supra,* § 271 (emphasis added). As we have explained, this is "nothing more than a modified application of the principle that although generally there is no duty in negligence terms to act for the benefit of any particular person, when one does indeed act for the benefit of another, he must act in a reasonable manner." *Ashburn,* 306 Md. at 631, 510 A.2d at 1085 (citing *Scott v. Watson,* 278 Md. 160, 170–71, 359 A.2d 548, 555 (1976); *Pennsylvania R.R. Co. v. Yingling,* 148 Md. 169, 129 A. 36 (1925)). Therefore, "[a] proper plaintiff ... is not without recourse. If he alleges sufficient facts to show that the defendant policeman created a 'special relationship' with him upon which he relied, he may maintain his action in negligence." *Ashburn,* 306 Md. at 630–31, 510 A.2d at 1085 (footnote and citation omitted). In order for a special relationship between police officer and an individual to be found, however, we required in *Ashburn* that it "be shown that the local government or the police officer affir-

matively acted to protect the specific victim or specific group of individuals like the victim, thereby inducing the victim's specific reliance upon the police protection." *Ashburn*, 306 Md. at 631, 510 A.2d at 1085 (citations omitted).

*Muthukumarana*, 370 Md. at 486–88, 805 A.2d 372 (footnote omitted).

In concluding that the public duty doctrine applies to 911 employees, the Court refused to adopt a specific, categorical list of factors to be considered in establishing a special relationship between a 911 employee and an individual, stating:

> We continue to believe that "the intent of the 'special relationship' doctrine is better addressed by our general standard outlined in *Ashburn*" because it preserves our ability to determine "whether a special relationship exists" on a "case-by-case basis." *Williams*, 359 Md. at 150, 753 A.2d at 67–68. Therefore, after incorporating 911 personnel into the purview of the public duty doctrine, we also find that the special relationship test in *Ashburn* is the appropriate analytical paradigm to be used in evaluating work-related negligence claims against 911 personnel. Under that test, in order for a special relationship between a 911 employee and a person in need of assistance to exist, it must be shown that the 911 employee affirmatively acted to protect or assist the specific individual, or a specific group of individuals like the individual, in need of assistance, thereby often inducing the specific reliance of the individual on the employee. Absent the existence of those factors, a special relationship may not be found to exist between the employee and the individual, and a 911 employee may not be held liable in tort to an individual.

*Id.* at 495–96, 805 A.2d 372 (footnote omitted). The Court declined to adopt a limited definition of "specific reliance," noting that "[a]lthough reliance may be a factor under [the special relationship] test, there may be many cases in which reliance is irrelevant to the analysis, such as here." *Id.* at 496 n. 31, 805 A.2d 372.

In *Horridge v. St. Mary's County Dep't of Soc. Services,* 382 Md. 170, 854 A.2d 1232 (2004), the Court of Appeals, for the first time, authorized a negligence action against the State based upon a special relationship arising from statutes. Specifically, *Horridge* alleged violations of §§ 5–701 through 5–714 of the Family Law Article ("FL") and certain regulations adopted by the Department of Human Resources to supplement the statutory requirements. The statutes generally required a local department of social services (DSS), after receiving a report of suspected child abuse or neglect, promptly to make a "thorough investigation" in order to protect the health, safety, and welfare of the child. *Id.* at 174, 854 A.2d 1232. The law further required that "if the report is of physical or sexual abuse, DSS must, within 24 hours, 'see the child,' attempt to have an on-site interview with the child's caretaker, and decide on the safety of the child." *Id.*

Eric Horridge filed a complaint against the State of Maryland and two DSS workers alleging, *inter alia,* negligence. He claimed that between December 1999 and February 2000, he made eight reports to the St. Mary's County DSS of physical abuse being inflicted on his minor son Collin by either Collin's mother or her boyfriend, and that a neighbor also reported the abuse. *Id.* at 175, 854 A.2d 1232. Horridge claimed that DSS failed to make a thorough investigation and take steps to protect Collin, as required by law, and that, as a result of that failure, Collin was beaten to death eight days after the last report of abuse was made.

The defendants relied upon the public duty doctrine and argued that " '[a]bsent an express intent by the Legislature to create such a duty, there was *no duty owed to Collin* individually.' " *Id.* at 187, 854 A.2d 1232. Relying on *Muthukumarana,* the Court of Appeals recognized that the public duty doctrine " 'has no application when the court concludes that a statute or court order has created a special duty or specific obligation to a particular class of persons rather than to the public at large.' " *Horridge,* 382 Md. at 187, 854 A.2d 1232 (quoting *Muthukumarana,* 370 Md. at 487, 805 A.2d 372 (quoting from DAN B. DOBBS, § 271, *supra.*)). The Court

went on to hold that the public duty doctrine did not bar Horridge's action because the Legislature *"has* created a duty flowing to children specifically identified to DSS as being the subject of suspected abuse." *Id.* The Court found:

> The duties imposed on DSS by FL § 5–706 and the implementing regulations of the Department of Human Resources ... require a prompt investigation of *each* reported incident of child abuse. The duty to act is mandatory; the steps to be taken are clearly delineated; and, most important, the statute makes clear in several places that the sole and specific objective of the requirement is the protection of a specific class of children—those identified in or identifiable from specific reports made to DSS and those also found in the home or in the care or custody of the alleged abuser. This is not an obligation that runs to everyone in general and no one in particular. It runs to an identified or identifiable child or discrete group of children.

*Id.* at 189–90, 854 A.2d 1232.

In support of its holding, the Court relied, in part, on *Jensen v. Anderson County DSS*, 304 S.C. 195, 403 S.E.2d 615 (1991), a case in which South Carolina's high court concluded that South Carolina's equivalent of FL § 5–706 imposed a special duty on DSS and its social workers "to investigate and intervene in cases where child abuse has been reported." *Horridge*, 382 Md. at 191, 854 A.2d 1232. The Court of Appeals noted that South Carolina had adopted a six-part test to determine when a statutory special relationship exists, but specifically declined to adopt such a test, stating:

> In reaching that conclusion, the *Jensen* court applied a six-part test to determine when a statutory special relationship exists: (1) an essential purpose of the statute is to protect against a particular kind of harm; (2) the statute, directly or indirectly, imposes on a specific public official a duty to guard against or not cause the harm; (3) the class of persons the statute intends to protect is identifiable before the fact; (4) the plaintiff is a person within the protected class; (5) the public officer knows or has reason to know the likelihood of harm to members of the class if he/she fails to

do his/her duty; and (6) the officer is given sufficient authority to act in the circumstances or undertakes to act in the exercise of his/her office.

It is not necessary to adopt precisely the six-part test enunciated by the South Carolina court in *Jensen,* although the elements of that test are analytically relevant and consistent with the considerations we noted in *Ashburn v. Anne Arundel County, supra,* 306 Md. 617, 627, 510 A.2d 1078, 1083, and *Remsburg v. Montgomery, supra,* 376 Md. 568, 583, 831 A.2d 18, 26. Clearly the essential purpose of the statutory duties created by FL § 5–706 and the implementing regulations of the Department of Human Resources was to protect a specific class of children, identified or identifiable before the fact from statutorily mandated reports, from a specific kind of harm likely to occur if the statutory duty is ignored. DSS is given not just a specific duty to act in response to such a report but ample and detailed authority to do so.

\* \* \*

The legislative policy of preventing future harm to children already reported to have been abused is so abundantly clear as to be beyond cavil, and, given the statutory mandate to act and the general waiver of tort immunity when State employees fail to act in a reasonable way and harm ensues, we can see no great burden or consequence to regarding this existing statutory duty as a civil one from which tort liability may arise. We cannot conceive that the Legislature intended, when a child is killed or injured, at least in part because DSS fails to perform the duties clearly cast upon it to make a site visit within 24 hours and a thorough investigation, for the only sanction to be the placement of a reprimand in some social worker's personnel file. The Legislature meant for DSS and its social workers to act immediately and aggressively when specific reports of abuse or neglect are made, and the best way to assure that is done is to find that they *do* have a special relationship with specific children identified in or, upon reasonable effort, identifiable from, facially reliable reports of abuse or

neglect and, subject to the State Tort Claims Act, to make them liable if harm occurs because they fail in their mandated duty.

*Id.* at 191–93, 854 A.2d 1232.

The Court of Appeals also rejected the contention that any negligence on DSS's part was passive in nature and that Collin's death was caused by the active negligence of either his mother or her boyfriend who beat him. The Court held that "[w]here the actionable duty is to protect another from harm, proximate cause must be judged in terms of the foreseeability of such harm being inflicted." *Id.* at 193–94, 854 A.2d 1232. The Court concluded that "[a] breach of duty by the defendant would result in his liability in the third party criminal activity context only if the breach enhanced the likelihood of the particular criminal activity which occurred." *Id.* at 195, 854 A.2d 1232 (citing *Scott v. Watson,* 278 Md. 160, 173, 359 A.2d 548 (1976)).

*Horridge* was recently distinguished in *Pendleton v. State,* 398 Md. 447, 921 A.2d 196 (2007), when the Court of Appeals held that the State had only a public duty of care, and not a special or statutory duty, to protect a child from the intentional acts of a third party after the child was removed from the custody of his parents and placed in a group foster home. The appellant, a ten-year-old boy, was removed from his mother's custody and placed in foster care in a group home where he was assigned to share a room with a sixteen-year-old boy who was also a resident in the group home. *Pendleton,* 398 Md. at 453, 921 A.2d 196. The appellant alleged that he was sexually and physically abused and battered by the sixteen-year-old boy while they shared a room. *Id.*

The appellant alleged that the State owed him a duty to keep him safe from harm. The appellant did not allege, however, that the sixteen-year-old had committed assaults on prior occasions or that the State had knowledge of any history of sexual assault by him. *Id.* at 454–55, 921 A.2d 196. The trial court dismissed the appellant's negligence claims against the State and an appeal was taken. Prior to consideration by

this Court, the Court of Appeals, on its own initiative, issued a writ of certiorari to consider the sole issue of whether the trial court erred in granting the motion to dismiss. *Id.* at 452, 921 A.2d 196.

The Court of Appeals held that the trial court did not err in granting the motion to dismiss because the appellant's complaint failed to allege sufficiently a duty on the part of the State. In reaching that conclusion, the Court rejected the appellant's argument that the State had a duty to protect him from the criminal acts of his attacker because of the duty imposed by statute and the special relationship between him and the State. With respect to the statutory duty, the appellant claimed that in enacting § 5–526(c) of the Family Law Article, which prohibited departments of social services from placing a child in a residential group home or other facility that is not operating in compliance with applicable State licensing laws, the Legislature created a duty to protect children, like him, who had been removed from their former, unsuitable custodial circumstance. *Id.* at 466, 921 A.2d 196. The Court acknowledged that evidence of negligence may be established by the breach of statutory duty, but to do so, the plaintiff must establish that he or she is a member of the class of persons the statute was designed to protect, that the injury was of the type the statute was designed to prevent, and that the statute sets forth mandatory acts clearly for the protection of a particular class of persons rather than the public as a whole. *Id.* at 466–67, 921 A.2d 196 (and cases cited therein).

The Court also acknowledged that the State's policies with respect to child welfare, which are enunciated in FL § 5–502, include a policy to protect minor children in its care. The Court concluded, however, that there was nothing in the record to suggest that the State violated this policy with respect to the appellant. Rather, the record showed that the State placed the appellant in a licensed group home, and the appellant did not allege that the State was negligent in licensing or monitoring the home or that the home was not operating in compliance with State licensing laws at the time appellant was placed in it. *Id.* at 467–68, 921 A.2d 196.

The Court distinguished *Horridge* on the ground that the relevant statutes in that case imposed specific and focused duties on the Department of Social Services, required prompt investigation of each reported incident of child abuse, and the sole and specific objective of the statutory provisions was the protection of a specific class of children. *Id.* at 469, 921 A.2d 196. The Court also recognized that once the group home "was apprized that the appellant had reported that he had been sexually abused and battered, it notified the State, as it was required to do, and the State acted immediately to address the situation." *Id.* at 470, 921 A.2d 196. The Court concluded that, "unlike the situation in *Horridge*, where the pleadings alleged a failure on the part of the State to respond as statutorily required, the complaint here contained no such sufficient allegation of the State's dereliction in failing to respond, once it was notified of the alleged incident of abuse. *Id.* at 470–71, 921 A.2d 196.

The Court also rejected the appellant's contention that the State's removal of him from his mother's care constituted an affirmative act which established a special relationship between him and the State. Relying in part on *Muthukumarana*, the Court recognized that "an 'affirmative act' sufficient to create a special relationship 'involves more than general actions taken to serve members of the public at large.'" *Id.* at 487, 805 A.2d 372 (quoting *Muthukumarana*, 370 Md. at 499, 805 A.2d 372). The Court stated:

> Removing the appellant from the care of his mother and placing him in the foster care program was a statutorily mandated and required act of the State. It was affirmative in the respect that the State took action to place him in the custody of the child welfare program, but it was not an 'affirmative act' sufficient to create a special relationship giving rise to a duty out of which a claim based on negligence can result. Without specifically applying the public duty doctrine to the State's actions in this instance, we hold that an affirmative act sufficient to create a special relationship must consist of something more (as in *Horridge*, albeit

statutorily mandated) than simply placing a child in foster care.

\* \* \*

Child welfare services pursuant to statute are services to the general public. The State, by creating a program of such services, available to the general public, does not create a special relationship to any particular individual. Generally, without factual allegations of some other affirmative act beyond that required under the general program, no common law special relationship to any specific individual normally will result. As we said in *Muthukumarana*, "[t]o find otherwise, by equating a duty to act with the provision of a general public service, might jeopardize the availability of those services in the first instance." 370 Md. at 499–500, 805 A.2d at 403. This decision "is consistent with our view of narrowly construing the 'special relationship' exception." *Patton*, 381 Md. at 642, 851 A.2d at 574.

*Id.* at 487–88, 805 A.2d 372.

With this understanding of Maryland law on negligence and, specifically, the element of duty, we turn now to the case before us.

### B. *Existence of a Special Relationship*

 We shall first consider whether a special relationship exists either between the State and Grimes or between the State and the Pulliams sufficient to give rise to a duty on the part of the State to protect the Pulliams from Grimes. As in *Lamb*, we look to § 315 of the Restatement, which articulates the general rule as follows:

There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

(b) a special relation exists between the actor and the other which gives the other a right to protection.

*See Lamb,* 303 Md. at 242, 492 A.2d 1297 (*quoting* Restatement (Second) of Torts § 315).

In *Lamb,* the Court of Appeals expressly adopted as Maryland common law § 319 of the Restatement which provides: "One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm." *Lamb,* 303 Md. at 243, 492 A.2d 1297. Although the Restatement does not define "takes charge" or "control," the Court of Appeals has concluded that § 319 has peculiar application to custodial situations. *Id.* at 243–44, 492 A.2d 1297.

■ In the case before us there is no indication that a custodial relationship existed between the MVA and MAB and Grimes. Accordingly, appellant cannot show a special relationship under subsection (a) of § 315 of the Restatement.

■ Nor can appellant establish a special relationship between the MVA and MAB and the Pulliams under subsection (b) of § 315 of the Restatement. In order for a special relationship to be found under subsection (b), it must be shown that the MVA or MAB affirmatively acted to protect the Pulliams or a specific group of individuals of which they were a part, thereby inducing their reliance upon the MVA or MAB. Here, the steps taken by the MVA and MAB were designed to protect both Grimes and the public at large. Neither the MVA nor the MAB acted to protect the Pulliams or any other specific individuals. In addition, there is no indication that the Pulliams specifically relied upon the MVA or MAB's protection. Accordingly, we hold that no special relationship existed either between the State and Grimes or between the State and the Pulliams sufficient to give rise to a duty on the part of the State to protect the Pulliams from Grimes.

## C. Breach of a Statutory Duty

 We next consider whether a statutory duty on the part of the MVA or MAB can be used as a foundation for a negligence claim by appellant. We shall begin by reviewing the motor vehicle laws and regulations relevant to the instant case.

Subject to certain exceptions that are not relevant to the case at hand, Maryland law prohibits an individual from driving or attempting to drive a motor vehicle on any highway in the state unless he or she holds a driver's license. Md.Code Ann., Transp. II ("TR") § 16–101(a).[4] Under TR § 16–103.1, the MVA is prohibited from issuing driver's licenses as follows:

The Administration may not issue a driver's license to an individual:

(1) During any period for which the individual's license to drive is revoked, suspended, refused, or canceled in this or any other state, unless the individual is eligible for a restricted license under § 16–113(e) of this subtitle;

(2) Who is an habitual drunkard, habitual user of narcotic drugs, or habitual user of any other drug to a degree that renders the individual incapable of safely driving a motor vehicle;

(3) Who previously has been adjudged to be suffering from any mental disability or mental disease and who, at the time of application, has not been adjudged competent;

(4) Who is required by this title to take an examination, unless the individual has passed the examination;

(5) Whose driving of a motor vehicle on the highways the Administration has good cause to believe would be inimical to public safety or welfare;

(6) Who is unable to exercise reasonable control over a motor vehicle due to disease or a physical disability, includ-

---

4. All statutory references to the Transportation Article are to Md.Code Ann., Transp. II (2006 Repl.Vol. and 2006 Supp.), and unless noted otherwise, were in effect as written at all times relevant to this appeal.

ing the loss of an arm or leg or both, except that, if the individual passes the examination required by this title, the Administration may issue the individual a restricted license requiring the individual to wear a workable artificial limb or other similar body attachment;

(7) Who is unable to understand highway warning or direction signs written in the English language;

(8) Who is unable to sign the individual's name for identification purposes;

(9) Who is 70 years old or older and applying for a new license, unless the applicant presents to the Administration:

(i) Proof of the individual's previous satisfactory operation of a motor vehicle; or

(ii) A written certification acceptable to the Administration from a licensed physician attesting to the general physical and mental qualifications of the applicant; or

(10) Who otherwise does not qualify for a license under this title.

The MVA is required to keep records of each driver's license that it issues and each licensee whose license to drive has been suspended or revoked, including the reasons for the action. TR § 16–117. The MVA may suspend, revoke, or refuse a driver's license for a variety of reasons, including if an individual "[i]s an unfit, unsafe, or habitually reckless or negligent diver of a motor vehicle." TR § 16–206(a)(1)(ii). In order "to enable the Administration to comply properly with the provisions of [Title 16] regarding the physical and mental conditions of individuals who seek to drive on the highways of this State," the MVA's Administrator may appoint a Medical Advisory Board comprised of qualified physicians and optometrists. TR § 16–118(a). The duties of the MAB are defined in TR § 16–118(c) as follows:

(1) The Administrator may refer to the Medical Advisory Board, for an advisory opinion, the case of any licensee or applicant for a license, if the Administrator has good cause to believe that the driving of a vehicle by him would be

contrary to public safety and welfare because of an existing or suspected mental or physical disability.

Section 16–119 of the Transportation Article mandates that the Department of Health and Mental Hygiene, together with the Medical and Chirurgical Faculty and the State Board of Examiners in Optometry, shall define, among other things, "[d]isorders characterized by lapses of consciousness." TR § 16–119(a). Conditions that can cause an individual to have a significant risk of lapses of consciousness are set forth in COMAR 11.17.03.02 B(2) and include epilepsy. The regulations recognize that individuals with the disorders set forth in B(2) "do not necessarily have a significant risk of lapses of consciousness." A judgment of significant risk is based on:

(a) Knowledge of an individual's past history of lapses of consciousness and the present state of the individual's health;

(b) How well the individual's disorder is controlled; or

(c) How much the individual's condition has improved.

COMAR 11.17.03.02–1B(4).

Both licensees and applicants for drivers licenses are required to notify the MVA if the licensee or applicant is diagnosed with any of the twenty disorders listed in COMAR 11.17.03.02–1, which include epilepsy, "[i]mpaired or loss of consciousness, fainting, blackout, or seizure[.]" Upon receipt of an application for a driver's license or renewal of a driver's license, an individual who has been treated for any of the disorders listed in COMAR 11.17.03.02–1, or who has been referred to the MAB for any reason, may be required by the MVA to obtain from his or her physician "a report indicating the onset of the condition, the physician's diagnosis and prognosis and the medication being prescribed." COMAR 11.17.03.03A. Upon receipt of the physician's report, the MAB is required to determine whether the physical or mental condition indicated "is of the type that might impair the individual's ability to operate a motor vehicle." COMAR 11.17.03.03B. If so, the individual may be scheduled to appear before a physician of the MAB for an interview. COMAR

11.17.03.03 B and C. COMAR contains specific guidelines that the MAB must use when making a recommendation to the MVA.

With respect to license suspensions resulting from seizures, the MVA is currently authorized to modify a 90–day suspension to a period greater or less than 90 days depending upon such evidence as the type and duration of seizures, the patern of seizures, and a driver's compliance with medication and treatment. *See* COMAR 11.17.03.04E(2). That was not the case at the time of Grimes' collision with the Pulliams. At that time, the regulation provided:

(a) The license or driving privilege of an individual with epilepsy may be suspended or refused for a period not to exceed 90 days unless the individual experiences a seizure within 90 days after the period of suspension or refusal begins.

(b) An individual whose license or driving privilege has been suspended or refused under the provisions of § E(2)(a) of this regulation may apply to have the suspension or refusal withdrawn by submitting evidence acceptable to the Medical Advisory Board of being free from seizures for at least 90 days.

(c) Periodic follow-up reports may be required by the Administration for review by the Medical Advisory Board.

Similarly, at the time of Grimes' collision with the Pulliams, TR § 16–208 provided, in relevant part:

(a) *Suspension; limitation in case of epilepsy.*—(1) Except as provided in paragraph (2) of this subsection, § 16–206(a)(4) and (c) of this subtitle, and § 16–404(c)(2) and (3) of this title, the Administration may not suspend a license or privilege to drive for a period of more than 1 year.

(2) Subject to the provisions of paragraph (3) of this subsection, after notice and hearing, the Administration may suspend for an indefinite period the license or privilege of any individual who cannot drive safely because of his physical or mental condition.

(3) If the Administration suspends or revokes a license of an individual based upon evaluation of competent medical evidence that the individual's driving may be adversely affected by the individual's epilepsy, the period of suspension or revocation may not exceed 90 days unless the individual experiences a seizure within 90 days after the period of suspension or revocation begins.

(4) If the Administration refuses to issue or renew the license of an individual based upon evaluation of competent medical evidence that the individual's driving may be adversely affected by the individual's epilepsy, the period of the refusal to issue or renew the license may not exceed 90 days unless the individual experiences a seizure within 90 days after the refusal to issue or renew the license.

(5) After the period of suspension, revocation, or refusal to issue or renew a license under paragraph (3) or (4) of this subsection, and if an individual is otherwise eligible, the Administration:

(i) Shall immediately issue to the individual a noncommercial Class C or Class M license;

(ii) Subject to the provisions of paragraph (6) of this subsection, may, upon request, immediately issue to the individual a license other than a noncommercial Class C or Class M license; and

(iii) Subject to the provisions of paragraph (6) of this subsection, shall, upon request, issue to the individual a license other than a noncommercial Class C or Class M license after a period not to exceed nine months.

(6) Before the Administration issues a license to an individual under paragraph (5)(ii) or (iii) of this subsection, the Administration may:

(i) Require the individual to be tested; and

(ii) Restrict the license issued to the individual after the individual becomes eligible to drive following a period of suspension, revocation, or refusal to issue or renew a license under paragraph (3) or (4) of this subsection by:

1. Designating the specific class of commercial or noncommercial license to be issued to the individual;

2. Designating the endorsements permitted on the individual's license; and

3. Imposing any other restriction authorized under § 16–113 of this title.

In response to the deaths of the Pulliams, the General Assembly amended TR § 16–208(a), effective October 1, 2003, by eliminating (a)(3), thereby allowing the MVA, subsequent to notice and a hearing, to suspend for an indefinite period the license or privilege of any individual who cannot drive safely because of his physical or mental condition.

Appellant contends that pursuant to the statutory scheme, and in light of the one incomplete and two missing seizure affidavits and Grimes' voluntary surrender of his license, the MVA had good cause to believe Grimes' driving of a motor vehicle on the highways would be inimical to public safety and welfare and, therefore, at the time Grimes applied for a duplicate license on February 16, 2002, the MVA should have refused to issue him a license or, alternatively, issued a license and immediately imposed a 90–day suspension.

Other jurisdictions considering similar cases have reached differing conclusions. Some have held that the State is liable in tort, even despite claims of sovereign immunity, for its failure to follow a mandatory statute pertaining to the issuance of drivers' licenses. *See, e.g., Oleszczuk v. State,* 124 Ariz. 373, 604 P.2d 637 (1979); *Department of Motor Vehicles v. Superior Court of Butte County,* 105 Cal.App.3d 537, 164 Cal.Rptr. 379 (1980)(because plaintiff did not allege a mandatory duty on the part of the DMV to revoke the driver's license, DMV was entitled to immunity for its discretionary licensing activities); *Alessi v. Allstate Ins. Co.,* 400 So.2d 1089 (La.App.1981)(cause of action against State permitted for negligence in issuing driver's license); *First Ins. Co. of Hawaii v. Int'l Harvester Co.,* 66 Haw. 185, 659 P.2d 64 (1983); *Trewin v. State of California,* 150 Cal.App.3d 975, 198 Cal.Rptr. 263 (1984)(dismissal of complaint was inappropriate where plaintiff

alleged the Department of Motor Vehicles had a mandatory duty to refuse to issue or renew a driver's license because it knew or should have known that licensee was unable to operate safely a motor vehicle); *Pendergrass v. State*, 66 Or.App. 607, 675 P.2d 505 (1984).

The facts of *Oleszczuk* are similar to the those of the case before us.[5] Prior to 1974, Arthur Bilodeau possessed an Arizona driver's license but had voluntarily surrendered it because of one or more collisions caused by his psychomotor disorder. *Oleszczuk*, 604 P.2d at 638–39. In July 1974, Bilodeau applied to the Arizona Motor Vehicle Department ("MVD") for a new driver's license and presented to the license examiner a letter from his doctor concerning his psychomotor disorder. At that time, Arizona statutory law required the MVD to establish a Medical Advisory Board, but it had not done so. As a result, there were no medical standards established to address Bilodeau's disorder. In addition, the MVD failed to comply with certain record keeping requirements and, as a result, at the time Bilodeau applied for a new driver's license, there was no record of his previous license surrender or traffic accidents. *Id.* at 639. Bilodeau did not answer questions on the license application asking if he was subject to epilepsy, seizures, or fainting spells, but the examiner, without Bilodeau's knowledge or permission, filled in these answers in the negative. *Id.* Without making any investigation into Bilodeau's fitness to drive, the MVD issued him a driver's license.

Thereafter, while operating a motor vehicle, Bilodeau became unconscious as a result of a psychomotor seizure and struck the rear of an automobile driven by Raymond Oleszczuk and occupied by three passengers. All of the occupants of Oleszczuk's vehicle were seriously injured, and one died as a result of his injuries. *Id.*

---

5. The decision in *Oleszczuk* was subsequently called into doubt by Arizona's intermediate appellate court in *Cady v. State*, 129 Ariz. 258, 630 P.2d 554 (1981), in which the court referred to *Oleszczuk* as an aberration in the law of public duty. *Cady*, 630 P.2d at 560.

The Oleszczuks filed a personal injury and wrongful death action against a number of defendants including the State of Arizona and the MVD alleging, *inter alia*, that the MVD negligently failed to keep a record of Bilodeau's previous accidents and license cancellations as required by statute, failed to establish a Medical Advisory Board, and filled in a false answer on Bilodeau's application. The trial court granted summary judgment on the ground that the duties breached by the state, if any, were owed to the public generally and not to the plaintiffs individually. *Id.*

The Supreme Court of Arizona reversed. In doing so, the court recognized Arizona case law that provided, as a general rule, that

> " '. . . if the duty which the official authority imposes upon an officer is a duty to the public, a failure to perform it, or an inadequate or erroneous performance, must be a public, not an individual injury, and must be redressed, if at all, in some form of public prosecution.' (citations omitted)"

*Oleszczuk*, 604 P.2d at 640 (quoting *Massengill v. Yuma County*, 104 Ariz. 518, 521, 456 P.2d 376, 379 (1969)). The court also recognized, however, "that in certain circumstances what begins as a public duty can be narrowed to a specific duty to an individual by the conduct of the public officer." *Oleszczuk*, 604 P.2d at 640. Emphasizing that such determinations must be made on a case-by-case basis, the court held:

> In the instant case, the statute, A.R.S. § 28–428, was designed to find and identify those drivers who, because of past history, might be dangerous to other users of the highway such as plaintiffs. A.R.S. § 28–432 mandated a Medical Advisory Board to assist in identifying the types of medical problems that might result in unsafe drivers. These duties are quite specific and obviously designed to protect that portion of the public using the highways. Likewise, that portion of the application which required that the applicant indicate whether he was subject to epilepsy, seizures, or fainting spells was similarly designed to protect people such as the plaintiffs who might be injured in an

automobile accident as a result of a driver suffering such a spell.

* * *

There is a difference between the general law enforcement duties to a police officer and the specific duty involved in the issuance of driver's licenses. The duty of the law enforcement officers in *Massengill, supra,* was not just to highway safety alone, but to the general safety of all persons whether using the highways or not. It was a wide variety of diversified duties that all law enforcement officers have to the general public.

The duty of the Motor Vehicle Department in the issuance of driver's licenses is more narrow. It is the specific duty of issuing driver's licenses. When there is a statute involved, the more specific and narrow the duty required by the statute, the more likely it is that the duty has been narrowed from a general duty to the public to a specific duty to an individual.

*Id.* 604 P.2d at 640–41.

Similarly, in *First Ins. Co. of Hawaii,* 659 P.2d at 68–69, the Supreme Court of Hawaii considered whether the City and County of Honolulu should be held responsible in part for damages flowing from a truck accident where the city's negligence in licensing the truck driver was found by a jury to be a causative factor. The truck driver had been issued a license, but no examination had been conducted to test his competence to drive the truck as required by Hawaii law. *Id.* The court held that "there was a duty owed by the City to the motoring public and pedestrians not to validate a truck-trailer driver's presence on the highways without an examination of his competence." *Id.* at 69. Relying in part on *Oleszczuk,* the court concluded that, "as the City's egregious conduct enhanced the possibility of harm befalling the victims of the accident, there was negligence that could give rise to recovery." *Id.*

*Pendergrass*, 66 Or.App. 607, 675 P.2d 505, is another case involving facts that are very similar to those before us. In that case, Lawrence Pendergrass, Jr. was killed when Gary Robb suffered an epileptic seizure, blacked out, lost control of his vehicle, and struck and killed Pendergrass, who was riding a bicycle. Robb's epileptic condition was known to the Motor Vehicle Division. In September 1977, pursuant to a regulation, the Motor Vehicle Division sent Robb a letter requesting a certificate from his physician and his personal affidavit as to seizures within the past two years. *Id.* at 506. Robb's personal affidavit was not returned. *Id.* An Oregon statute provided that failure to comply with a request for information within 45 days would result in the immediate suspension of a driver's license, but suspension proceedings were never commenced. *Id.*

Robb's motor vehicle file was "red stopped," meaning that if Robb had applied for renewal of his license, the Medical Reexamination Unit would have been notified. *Id.* However, the "red stop" was never entered in the Motor Vehicle Division's computer and, in May 1978, Robb's license was renewed. Subsequently, Robb also received a duplicate license, but the Medical Reexamination Unit was never notified.

The plaintiff claimed that the Motor Vehicle Division was negligent in failing to suspend or prevent renewal of Robb's driver's license and that its negligence caused Pendergrass' death. The State of Oregon contended that the alleged failures constituted discretionary acts that were immune from liability under Oregon law. The court rejected the state's argument, explaining that the statute only limited governmental tort immunity to decisions involving the exercise of policy judgment, and did not immunize decisions that implemented or applied policy. The court ruled that the types of procedures implemented by statute, which required field officers to be apprized of pending medical evaluations and for field officers to inform the Medical Reexamination Unit that an individual subject to a medical re-evaluation had applied for renewal, were not the type that necessarily required the exercise of governmental discretion. The court also held that

whether establishment of the procedures was discretionary constituted a question of fact and the burden of proof rested with the state.

Other jurisdictions have held that the state cannot be held liable for failure to comply with a mandatory licensing requirement. *See e.g., Chikofsky v. State,* 203 Misc. 646, 117 N.Y.S.2d 264 (Ct. of Claims 1952)(no action for state's failure to seize license of habitual offender upon grounds that that duty is to public in general); *Guillot v. State,* 364 So.2d 254 (La.Ct.App. 1978) (involving the state's failure to retake a license); *Southworth v. State of New York,* 47 N.Y.2d 874, 419 N.Y.S.2d 71, 392 N.E.2d 1254 (1979); *Ryan v. State of Rhode Island, et al.,* 420 A.2d 841 (1980); *Kolbe v. State of Iowa,* 625 N.W.2d 721 (2001).

In *Southworth,* the plaintiff alleged that the state was liable for injuries and death sustained in an automobile collision because it negligently established and operated an experimental driver's rehabilitation program and negligently issued an interim driver's license to an individual who had a record of alcohol-related driving violations. The Court of Appeals of New York found no basis for a claim of negligence on the part of the state in issuing the interim driver's license because the plaintiff had conceded that the driver was indeed eligible to receive the interim license at the time it was issued. Nevertheless, the court cautioned as follows:

> This determination, however, should not be read as suggesting that the State might have been liable if the Motor Vehicle Department had been negligent in issuing the license. Statutes and regulations adopted in the exercise of the police power are, of course, designed to protect the general public from certain known or anticipated harms. But it is settled that the State and its subdivisions acting "for the protection of the general public, cannot be cast in damages for a mere failure to furnish adequate protection to a particular individual to whom it assumed no special duty." (*Evers v. Westerberg,* 38 A.D.2d 751, 329 N.Y.S.2d 615, *aff'd,* 32 N.Y.2d 684, 343 N.Y.S.2d 361, 296 N.E.2d 257). It would seem that this principle should apply to the administration

and enforcement of State licensing requirements. We also note that when State officials negligently issue a license or fail to revoke it, the State action is generally held not to be the proximate cause of the injury inflicted by the licensee (see State's Liability for Improperly Licensing Negligent Drivers, Ann., 79 A.L.R.3d 955).

*Southworth,* 47 N.Y.2d at 876, 419 N.Y.S.2d 71, 392 N.E.2d 1254.

Likewise, in *Ryan,* 420 A.2d 841, the plaintiffs alleged that certain state entities were negligent in reinstating Ryan's driver's license without making a statutorily required investigation of his character, habits, and driving abilities when Ryan's license had been subject to three suspensions. The trial court dismissed the plaintiff's complaint. The Supreme Court of Rhode Island, relying in part on *Southworth,* affirmed the dismissal on the ground that "[i]n suits brought against the state, plaintiffs must show a breach of some duty owed them in their individual capacities and not merely a breach of some obligation owed the general public." *Id.* at 843 (and cases cited therein).

Similarly, in *Kolbe,* 625 N.W.2d 721, the Supreme Court of Iowa held that the state cannot be held liable for negligence in issuing a driver's license to an individual who caused injury with his motor vehicle. In that case, Justin Schulte was issued a restricted driver's license which required him to wear corrective lenses and not operate a motor vehicle in excess of forty-five miles per hour. Schulte had obtained his driver's license through an Iowa Department of Transportation program that permitted the issuance of driver's licenses on a discretionary basis. While operating a motor vehicle, Schulte struck and injured Charles Kolbe, a bicyclist.

Kolbe and his wife filed suit alleging, *inter alia,* that the state negligently issued a driver's license to Schulte without adequate investigation. The trial court granted summary judgment in favor of the defendants on the grounds that the state was immune from suit under a discretionary function

exception to the Iowa's Tort Claims Act and that the state owed no duty to the Kolbes.

On appeal, the Supreme Court of Iowa upheld the grant of summary judgment, holding that even if the state had breached a statutory provision in issuing a license to Schulte, that breach did not give rise to a private cause of action. *Id.* at 726. The court held that there was no indication of legislative intent to create a remedy for a statutory violation. In addition, the court rejected the Kolbes' contention that the common law imposed on the state an affirmative duty to exercise ordinary care to avoid injury to persons in carrying out the functions it undertakes, whether or not those functions are mandated by statute or regulation. *Id.* at 727–28. Relying on §§ 314 and 315 of the Restatement, and recognizing that Iowa had not abolished the public duty doctrine, but only narrowed its application, the court held:

> We have routinely held that a breach of duty *owed to the public at large* is not actionable *unless the plaintiff can establish, based on the unique or particular facts of the case, a special relationship between the State and the injured plaintiff* consistent with the rules of Restatement (Second) of Torts section 315. Our holdings have been 'consistent with the principle that public employees share the same—but not greater—liability to injured parties as other defendants under like circumstances.' The duty to the public can either arise from a statue or from the State's obligation to protect the public at large.

We agree with the State that the licensing provisions of Iowa Code chapter 321, and more specifically Iowa Code section 321.177(7) are for the benefit of the public at large. Accordingly, we reject the Kolbes' contention that they can avoid the preclusive effect of the public duty doctrine by claiming membership to a special, identifiable group for whose benefit the statutes were enacted. Furthermore, as mentioned, the Kolbes do not claim a special relationship arising out of the particular facts of this case. For these reasons, we conclude that there are no facts establishing a

special relationship upon which the Kolbes' claims of liability may be premised.

*Id.* at 729–30 (emphasis in original).

In addition, the court articulated public policy considerations in support of its decision, including that recognition of tort liability for negligent issuance of a driver's license "would likely chill the State's licensing determinations" and make it "unreasonably difficult for certain segments of our society to secure a driver's license." The court concluded that since the motor vehicle field is highly regulated by statute, a decision to impose liability should be made by the legislature. *Id.*

Turning now to the case *sub judice,* we join those states that have determined that the state cannot be held liable in tort for its failure to follow a mandatory statute pertaining to the issuance of drivers' licenses. In doing so, we recognize that the statutory and regulatory scheme addressing the issuance of licenses to persons suffering from diseases such as epilepsy and other seizure disorders was designed, in part, to protect the general public from harm caused by a licensee who suffers the effects of a seizure or lapse of consciousness while operating a motor vehicle. As the Court of Appeals recognized in both *Pendleton* and *Ashburn,* in order to use a statutory duty as the foundation for a negligence claim, the statute must " 'set forth mandatory acts clearly for the protection of a *particular class* of persons rather than the public as a whole.' " *Pendleton,* 398 Md. at 467, 921 A.2d 196 (quoting *Ashburn,* 306 Md. at 635, 510 A.2d 1078 (and cases cited therein))(emphasis in original).

In *Horridge,* 382 Md. 170, 854 A.2d 1232, the pertinent statutes mandated that the DSS respond to each reported incident of child abuse in order to protect the specific child or children who were the subject of the reported abuse. Here, the statutory scheme prohibits the issuance of a license to an individual when the MVA has good cause to believe that the individual's driving of a motor vehicle on the highways would be inimical to public safety and welfare. In both *Horridge* and the instant case, the pleadings alleged a failure on the

part of the State to respond as statutorily required. In both cases, the plaintiffs alleged that the State violated an affirmative duty of care, statutorily created, the benefits of which redounded to the injured parties. In the instant case, however, the benefits of the statutory scheme—protection from an accident caused by an individual suffering a seizure while operating a motor vehicle—redounded to the general public. Since the duty created by the statute and regulations was owed to the public generally, the circuit court did not err in dismissing the claims against the MVA and MAB.

### D. Dismissal Prior to Discovery

Appellant contends that the circuit court erred in dismissing the claims against the MVA and MAB prior to completion of discovery and requests that we remand this matter to the circuit court to permit further discovery. We decline the invitation to do so. For the reasons set forth above, even assuming the truth of all the well-pleaded factual allegations of the amended complaint, including the reasonable inferences that may be drawn from them, and reviewing the amended complaint in the light most favorable to appellant, we have concluded that the complaint would not provide appellant with a judicial remedy. As a result, the circuit court did not err in granting the motion to dismiss or in ruling on it prior to the completion of discovery. Moreover, appellant has not directed our attention to any place in the record where she requested the circuit court to defer its decision on the State's motion to dismiss to allow for discovery. *See e.g.* Md. Rule 2–322(c)("A motion under sections (a) and (b) of this Rule shall be determined before trial, except that a court may defer the determination of the defense of failure to state a claim upon which relief can be granted until the trial.") Since the issue was not raised below, it is not properly preserved for our review. Md. Rule 8–131.

### E. Abrogation of the Public Duty Doctrine

Finally, appellant directs our attention to numerous cases from across the United States that have rejected the

public duty doctrine, and asks us to join those states and declare that the public duty doctrine is contrary to Maryland public policy. This we shall decline to do. To be sure, we are mindful of the tragic nature of this case. Nevertheless, in *Horridge, Muthukumarana,* and other cases discussed *supra,* the Court of Appeals had occasion to consider the public duty doctrine, *i.e.,* "when a statute or common law 'imposes upon a public entity a duty to the public at large, and not a duty to a particular class of individuals, the duty is not one enforceable in tort,'" *Horridge,* 382 Md. at 187, 854 A.2d 1232 (quoting *Muthukumarana,* 370 Md. at 486, 805 A.2d 372 (quoting Dan B. Dobbs, The Law of Torts § 271 (2000))), and did not abrogate the doctrine. In *Horridge,* the Court merely determined that it "has no application when the court concludes that a statute or court order has created a special duty or specific obligation to a particular class of persons rather than to the public at large." 382 Md. at 187, 854 A.2d 1232. Subsequent to *Horridge,* neither the Court of Appeals nor the General Assembly has taken any action to abrogate the doctrine. We shall not do so either.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**