38 A.3d 418

**Nicole PACE, as Mother and Next Friend of Liana Pace**

v.

**STATE of Maryland.**

**No. 132, Sept. Term, 2010.**

Court of Appeals of Maryland.

Feb. 22, 2012.

Philip J. Sweitzer, Baltimore, MD, for Petitioner.

William H. Fields, Asst. Atty. Gen. (Douglas M. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for Respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and JOHN C. ELDRIDGE, (retired, specially assigned), JJ.

GREENE, J.

The mother of a kindergarten student who suffered a serious allergic reaction after consuming peanut butter given to her under her school's free lunch program brought suit in the Circuit Court for Frederick County against the State of Maryland and its agents, alleging that the State's obligations under the National School Lunch Act, 42 U.S.C. §§ 1751–1769 (2006) ("NSLA") imposed upon the defendants a statutory duty of care to ensure that children with food allergies are not served lunches containing allergens. The trial court granted the State defendants' motion to dismiss on the ground that the NSLA merely establishes a subsidized lunch program for the benefit all children at participating schools, and does not impose a specific statutory duty of care towards children with food allergies. The Court of Special Appeals affirmed the dismissal. After examining the statute at issue, we agree with the determinations of the trial and intermediate appellate courts and therefore also affirm the dismissal, as a negligence action may not be maintained in the absence of a demonstrable duty.

## FACTS AND PROCEDURAL HISTORY

Liana Pace, a five-year-old kindergarten student, suffered an anaphylactic [1] reaction after being exposed to peanut butter

---

1. Anaphylaxis has been defined as "an acute, life-threatening ... allergic reaction that occurs in previously sensitized people when they are reexposed to the sensitizing antigen." *The Merck Manual of Diagnosis*

at lunchtime. It is alleged that at the beginning of the school year, Liana's mother, Nicole Pace, informed Hillcrest Elementary School in Frederick, Maryland, about her daughter's severe allergy to peanuts. In October, Liana's allergist provided the school nurse with a pre-measured dose of epinephrine to be used in the event Liana was exposed to peanut products.

On November 9, 2005, Liana went to the school cafeteria without a lunch or sufficient funds in her cafeteria account to purchase a lunch. In these instances, Hillcrest Elementary would serve students a "credit lunch" consisting of either a bologna sandwich or a peanut butter sandwich. These lunches were subsidized by federal funds administered by the State of Maryland under the National School Lunch Act ("NSLA"). On this particular day, a cafeteria worker gave Liana a peanut butter sandwich. Liana resisted eating the sandwich, informing the worker that she was not allowed to have peanut butter. The worker mistook her protests as misbehavior and ordered her to eat the sandwich. Liana complied. The child immediately began experiencing an anaphylactic reaction; her airway and eyelids began to swell, and she became lethargic and confused. Approximately a half an hour later, she was taken to the nurse's suite and her mother was contacted. Ms. Pace told the nurse to administer the epinephrine dose. Shortly thereafter, Ms. Pace arrived at the school and rode with her daughter in an ambulance from the elementary school to Frederick Memorial Hospital, where Liana was observed and eventually released.

Following the allergic episode, Liana began to "experience symptoms of extreme psychological perturbation and post-

---

*and Therapy* 1120 (Robert S. Porter et al. eds., 19th ed. 2011). Anaphylactic shock occurs when "[e]ntry of the allergen into the bloodstream provokes the release of massive amounts of histamine and other chemicals with effects on body tissues. The blood vessels widen, with a sudden severe lowering of blood pressure. Other symptoms include an itchy, raised rash (hives), broncho-spasm (constriction of the airways in the lungs), pain in the abdomen [and] swelling of the tongue or throat ...". The American Medical Association, *Encyclopedia of Medicine* 98 (Charles B. Clayman, ed. 1989).

traumatic distress," exhibit "regressive behavior such as thumb sucking and withdrawal" and, ultimately, fear attending school. As a result, at the close of 2005, Ms. Pace withdrew Liana from Hillcrest Elementary and moved with her daughter to Michigan to reside with Liana's maternal grandmother.

On November 8, 2006, Nicole Pace (hereinafter "Ms. Pace" or "Petitioner") filed suit on behalf of her daughter in the Circuit Court for Frederick County against the State of Maryland, the Maryland State Department of Education (MSDE), the State Superintendent of Schools, (hereinafter "the State defendants" or "Respondents"), the Board of Education of Frederick County, the Superintendent of the Frederick County Public Schools, the principal of Hillcrest Elementary, and three unnamed cafeteria workers (hereinafter "the County defendants").[2] While Ms. Pace asserted a variety of claims against the County defendants, her complaint included only a single count of negligence against the State defendants, based on an alleged breach of a statutory duty under the National School Lunch Act (NSLA). It alleged in pertinent part:

19. [The State] [d]efendants ... are under a regulatory duty pursuant to COMAR 13A.06.01.01 to administer the State's public school lunch programs in accordance with the provisions of the [NSLA], codified as amended at 42 U.S.C. § 1751 *et seq.* (2006). The statutory provisions of the Act impose an affirmative duty on the State of Maryland to tailor school lunch program menus and foods offered to individual students according to their "individual dietary and medical" needs. 42 U.S.C. § 1758 (2006). The Code of Federal Regulations also requires monitoring by the states to ensure compliance with the statute. 7 C.F.R. § 15b; 7 C.F.R. § 210.10(g)(1).

20. The explosive nature of peanut allergy, moreover, is specifically well-known to the State, which has developed extensive policies for the management of anaphylactic reac-

---

**2.** The County defendants eventually settled with Petitioner; therefore, the instant case involves only the suit against the State defendants.

tions; however, the State has not applied these metrics and administrative strategies to the management of individual dietary needs of students in school lunch programs, statewide. The State, therefore, has breached its statutory duty under the [NSLA]. This is all the more egregious, because the State has an extensive policy for after-the-fact management of anaphylactic reactions, yet no specific administrative protocol in place to minimize dietary exposures in school lunch programs so such exposures do not occur.

21. As a result of the State's negligence, school administration and cafeteria staff at the Hillcrest Elementary School did not have the proper dietary "flagging" regimen or administrative program in place, to notify cafeteria workers of Liana's extreme allergic sensitivity.

22. As a result of the State's negligence, school administration at the Hillcrest Elementary School did not have a uniform plan implemented to inform cafeteria workers, who served Liana the very foodstuff she could not tolerate, which produced the life-threatening anaphylactic reaction and accompanying fear and severe emotional distress.

On February 27, 2007, the State defendants moved to dismiss the complaint, arguing that they were not proper parties to the action because the State's role under the NSLA is limited to reimbursement and periodic monitoring, while the local school boards actually operate the school lunch program within their districts. They also moved to dismiss on the ground of governmental immunity. On March 15, 2007, Ms. Pace filed a response to the motion to dismiss reiterating her allegation that the NSLA places an independent duty on the State "to administer school lunch and free feeding programs in accordance with individual student dietary and medical needs," and cited to several federal regulations not included within the complaint. On this same day, Ms. Pace filed an amended complaint that corrected typographical errors, but otherwise made clear that it "incorporate[d] the allegations of the original Complaint essentially verbatim." The Circuit Court held a hearing on the State defendants' motion on June 20, 2007, and in a later-filed opinion and order, determined that Ms. Pace

had failed to state a claim upon which relief could be granted. The court ruled:

> In the case *sub judice*, it is not disputed that the State had a statutory obligation to establish a free feeding program and to ensure that it was implemented in the schools. This program includes a provision to ensure that the needs of children with special dietary needs are met. However, the State did not have a specific statutory duty to control the acts of the school employees or to ensure that each child received the correct food.[3]

Ms. Pace appealed the trial court's dismissal, and the Court of Special Appeals affirmed the ruling. *Pace v. State*, 195 Md.App. 32, 5 A.3d 1121 (2010). The intermediate appellate court stated:

> [W]e conclude that the circuit court did not err in concluding that the NSLA does not impose a special duty upon the State defendants to exercise a greater degree of care for students with food allergies than the general level of care for health and safety the State defendants exercise for all students in public schools.

*Pace*, 195 Md.App. at 52, 5 A.3d at 1132.

We granted Petitioner's writ of certiorari, *Pace v. State*, 418 Md. 190, 13 A.3d 798 (2011), which asked us to determine:

> Whether the trial court erred in granting the State Defendants' Motion to Dismiss, finding that the State had no duty of care to the Plaintiff['s daughter], rather than a special or statutory duty to ensure her 'individual,' 'special' dietary needs were met and to protect her from discrimination on

---

**3.** On December 27, 2007, Ms. Pace filed a second amended complaint. The complaint alleged that upon her return to school, Liana was seated alone during lunch time with a sign overhead that made known her peanut allergy, allegedly in violation of 7 C.F.R. § 210.23(b). On January 15, 2008, the State defendants moved to dismiss this complaint because Ms. Pace had failed to obtain leave to amend after the previous dismissal with prejudice, in violation of Maryland Rule 2–322(c). The court granted the motion and dismissed the second amended complaint on February 29, 2008. Because the propriety of this ruling is not before us, we do not address it and focus solely on the dismissal of the first amended complaint.

the basis of either race or disability in the administration of the school lunch program[.]

We answer that question in the negative and therefore affirm the judgment of the Court of Special Appeals.

## STANDARD OF REVIEW

To sufficiently plead a cause of action for negligence in Maryland, a plaintiff must "allege with certainty and definiteness, facts and circumstances sufficient to set forth (a) a *duty* owed by the defendant to the plaintiff, (b) a *breach* of that duty and (c) injury *proximately* resulting from that breach." *Pendleton v. State,* 398 Md. 447, 458, 921 A.2d 196, 202–03 (2007) (emphasis in original) (quoting *Scott v. Jenkins,* 345 Md. 21, 28, 690 A.2d 1000, 1003 (1997)). Thus, the initial requisite element is that "there must exist a duty which is owed by the defendant to the plaintiff to observe that care which the law prescribes in the given circumstances...." *Jackson v. Pennsylvania R.R. Co.,* 176 Md. 1, 5, 3 A.2d 719, 721 (1939). As we have said "[t]he existence of a duty is a matter of law to be determined by the court and, therefore, is an appropriate issue to be disposed of on motion for dismissal." *Bobo v. State,* 346 Md. 706, 716, 697 A.2d 1371, 1376 (1997); *accord Pendleton,* 398 Md. at 461, 921 A.2d at 204 ("Whether a legal duty exists is a question of law, to be decided by the court." (citations omitted)); *Valentine v. On Target, Inc.,* 353 Md. 544, 549, 727 A.2d 947, 949 (1999) ("Generally, whether there is adequate proof of the required elements needed to succeed in a negligence action is a question of fact to be determined by the fact finder; but, the existence of a legal duty is a question of law to be decided by the court.").

"When reviewing a motion to dismiss for failure to state a claim, trial and appellate courts must assume the truth of all well-pleaded, relevant, and material facts in the complaint and any reasonable inferences that can be drawn therefrom." *Muthukumarana v. Montgomery County,* 370 Md. 447, 474, 805 A.2d 372, 388 (2002) (internal quotation omitted);

*accord Pendleton,* 398 Md. at 458–59, 921 A.2d at 203; *Debbas v. Nelson,* 389 Md. 364, 372, 885 A.2d 802, 807 (2005); *Horridge v. St. Mary's County Dep't of Soc. Services,* 382 Md. 170, 175, 854 A.2d 1232, 1234–35 (2004); *Porterfield v. Mascari II, Inc.,* 374 Md. 402, 414, 823 A.2d 590, 597 (2003). "Dismissal is proper only if the alleged facts and permissible inferences, so viewed, would, if proven, nonetheless fail to afford relief to the plaintiff." *Ricketts v. Ricketts,* 393 Md. 479, 492, 903 A.2d 857, 864 (2006); *accord Valentine,* 353 Md. at 548, 727 A.2d at 949.

█ In the instant case, the trial court dismissed the complaint for failure to state a claim upon which relief could be granted, based on the absence of a well-pled statutory duty in the State defendants to prevent the harm that occurred. We review that ruling to "determine whether the trial court was legally correct, examining solely the sufficiency of the pleading." *Bobo,* 346 Md. at 709, 697 A.2d at 1373; *Ricketts,* 393 Md. at 492, 903 A.2d at 865. Therefore, in order for Petitioner's suit to have properly survived a motion to dismiss, the complaint must have sufficiently alleged that the State defendants owed Liana a duty in tort. We shall hold that the trial court was legally correct in its dismissal, and therefore affirm under the reasoning discussed, *infra.*

## DISCUSSION

█ Duty is a foundational element in a claim of negligence because, as we have said, "negligence is a breach of a duty owed to one, and absent that duty, there can be no negligence." *Ashburn v. Anne Arundel County,* 306 Md. 617, 627, 510 A.2d 1078, 1083 (1986); *accord Pendleton,* 398 Md. at 461, 921 A.2d at 204 ("[W]hen analyzing a negligence action it is customary to begin with whether a legally cognizable duty exists." (citations omitted)); *Bobo,* 346 Md. at 714, 697 A.2d at 1375 ("[T]he existence of a duty is the threshold question."); *W. Va. Central R. Co. v. Fuller,* 96 Md. 652, 666, 54 A. 669, 671 (1903) ("[T]here can be no negligence where there is no duty that is due. . . ."). This Court has adopted Prosser and Keeton's definition of duty as "an obligation, to which the law will

give recognition and effect, to conform to a particular standard of conduct toward another." *See Remsburg v. Montgomery*, 376 Md. 568, 582, 831 A.2d 18, 26 (2003) (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 53 at 356 (5th ed. 1984)); *Horridge*, 382 Md. at 182, 854 A.2d at 1235; *Ashburn*, 306 Md. at 627, 510 A.2d at 1083. As Prosser and Keeton note, "duty is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 53 at 358 (5th ed. 1984) (internal quotation marks omitted). We have explained that in order to determine whether a duty exists, relevant considerations necessarily include "the nature of the harm likely to result from a failure to exercise due care, and the relationship that exists between the parties." *Jacques v. First Nat'l Bank*, 307 Md. 527, 534, 515 A.2d 756, 759 (1986).

█ As a general rule, a person "is under no special duty to protect another from . . . acts by a third person, in the absence of statutes, or of a special relationship." *Horridge*, 382 Md. at 183, 854 A.2d at 1239 (quoting *Scott v. Watson*, 278 Md. 160, 166, 359 A.2d 548, 552 (1976)); *accord Valentine*, 353 Md. at 551–52, 727 A.2d at 950–51; *Bobo*, 346 Md. at 715, 697 A.2d at 1376; *Ashburn*, 306 Md. at 628, 510 A.2d at 1083. Petitioner concedes that there was no special relationship between Liana and the State defendants in the instant case because the State was neither involved in the underlying incident, nor did the State defendants have any specific knowledge of Liana's particular allergy.[4] Petitioner claims, however,

---

4. As we have stated, "[t]his 'special duty rule,' as it has been termed by the courts, is nothing more than a modified application of the principle that although generally there is no duty in negligence terms to act for the benefit of any particular person, when one does indeed act for the benefit of another, he must act in a reasonable manner." *Remsburg*, 376 Md. at 595, 831 A.2d at 34 (quotation omitted).

   In this instant case, the trial court stated that "Plaintiff in the case *sub judice* concedes that the State did not have a special relationship with Plaintiff giving rise to a special duty." Also, the intermediate appellate court noted that "in the absence of any allegations of special

that the State defendants may be held independently liable for the underlying events based upon a statutory duty owed to Liana under the NSLA. Respondents argue, conversely, that the only duties included in the NSLA are duties owed to the general public.

The public duty doctrine provides that "when a statute or common law 'imposes upon a public entity a duty to the public at large ... the duty is not one enforceable in tort.'" *Muthukumarana*, 370 Md. at 486, 805 A.2d at 395 (internal quotation omitted). A frequently cited example is that "the 'duty' owed by the police by virtue of their positions as officers is a duty to protect the public," *Ashburn*, 306 Md. at 628, 510 A.2d at 1084 (citations omitted), and is thereby not enforceable in tort by a member of the public claiming that the police failed to protect them, specifically. *Muthukumarana*, 370 Md. at 486–87, 805 A.2d at 395. The public duty doctrine does not apply, however, where a court concludes that "a statute or court order has created a *special duty* or specific obligation to a particular class of persons rather than to the public at large." *Muthukumarana*, 370 Md. at 487, 805 A.2d at 396 (emphasis in original) (internal quotation omitted); *Ashburn*, 306 Md. at 635, 510 A.2d at 1087 (noting that in order to find a duty flowing to an individual plaintiff, the statute must "set forth mandatory acts clearly for the protection of a *particular class* of persons rather than the public as a whole" (emphasis in original) (internal quotation omitted)). Therefore, in order to invoke a statutory duty as grounds for a negligence claim, "the plaintiff must show that it was within the class of persons the legislation was intended to protect and that the alleged injury was the type of harm which the statute was intended to prevent." *Remsburg*, 376 Md. at 584, 831 A.2d at 27 (quoting *Geo. Byers Sons, Inc. v. East Europe Import Export, Inc.*, 463 F.Supp. 135, 138 (D.Md.1979)).

interaction between the [Paces] and the State defendants, there was no basis for finding a duty created by a special relationship in this case." *Pace*, 195 Md.App. at 52, 5 A.3d at 1132–33.

This Court has analyzed this requirement on several occasions, and each party in the instant case touts one of our precedents, explained *infra*, as applicable to the statutory language at issue. Petitioner argues that she has satisfied her burden to show that the NSLA was intended to protect children with special dietary needs and that the harm Liana suffered was of the type the statute was designed to prevent. In this argument, she relies on our holding in *Horridge v. St. Mary's County Department of Social Services*, 382 Md. 170, 854 A.2d 1232 (2004).

In *Horridge* we determined that the complaint at issue presented a well-pled allegation of a statutory duty owed by the State to a specific class of individuals. Under the facts presented in the pleading, a father who was aware that his nineteen-month-old son was being abused by the child's mother or her boyfriend, repeatedly reported the attacks to the Department of Social Services. *Horridge*, 382 Md. at 176, 854 A.2d at 1235. In response, however, the state agency engaged in only cursory investigations of his allegations, accused Mr. Horridge of being a "disgruntled parent," and finally directed him to stop calling the Department. *Horridge*, 382 Md. at 177, 854 A.2d at 1235. Then, tragically, eight days after the last report was made and ignored, the child was beaten to death. *Horridge*, 382 Md. at 177, 854 A.2d at 1236. The trial court granted the State defendants' motion to dismiss for failure to state a claim upon which relief could be granted, noting that any statutory duty to protect children identified as being abused was owed to the public generally and, therefore, was not enforceable in tort. *Horridge*, 382 Md. at 175, 186–87, 854 A.2d at 1241.

This Court reversed, noting that under the pertinent statute, Maryland Code § 7–706 of the Family Law Article, the Department of Social Services was required to respond to *each* reported incident of child abuse or neglect and take affirmative steps, including actually seeing the child and deciding on the safety of the child within 24 hours of a report. *Horridge*, 382 Md. at 184–85, 854 A.2d at 1240. It was clear that the statute's "essential purpose ... was to protect a

specific class of children, identified or identifiable before the fact from statutorily mandated reports, from a specific kind of harm likely to occur if the statutory duty is ignored." *Horridge*, 382 Md. at 192, 854 A.2d at 1244. We explained that, unlike statutes which create only a public duty:

> The duties imposed on DSS by FL § 5–706 and the implementing regulations of the Department of Human Resources are far more specific and focused. They require a prompt investigation of *each* reported incident of child abuse. The duty to act is mandatory; the steps to be taken are clearly delineated; and, most important, the statute makes clear in several places that the sole and specific objective of the requirement is the protection of a specific class of children—those identified in or identifiable from specific reports made to DSS and those also found in the home or in the care or custody of the alleged abuser. This is not an obligation that runs to everyone in general and no one in particular. It runs to an identified or identifiable child or discrete group of children.

*Horridge*, 382 Md. at 189–90, 854 A.2d at 1243 (emphasis in original); *c.f. Hayes v. State*, 183 Md.App. 742, 754, 756, 963 A.2d 271, 278, 280 (2009) (holding that the same statute discussed in *Horridge* "does not create a legally cognizable duty to a parent accused of abuse," as it "would not further the protection of children from abuse or neglect.").

The State defendants, in the instant case, by contrast, argue that their responsibility under the NSLA is unlike that presented in *Horridge*, but rather, is analogous to those statutes interpreted in our case law to invoke the public duty doctrine and thereby bar tort claims by an individual plaintiff.[5]  In

---

5. The intermediate appellate court has also considered the application of the public duty doctrine on several occasions.  In *Willow Tree Learning Center, Inc. v. Prince George's County*, 85 Md.App. 508, 584 A.2d 157 (1991), a child was fatally injured while using playground equipment at a child care center.  The court held that County and State regulations mandating safety inspections of playground equipment created a duty owed only to the general public and were not aimed at the protection of a specific class of individuals. *Willow Tree*, 85 Md.App. at

*Pendleton v. State,* 398 Md. 447, 921 A.2d 196 (2007), a child was abused by a roommate after he was placed by the State into a duly licensed group home. The victim's father, as next friend, argued on behalf of his son that the State owed a duty to the child to ensure his safety while in the group home. As support for this assertion, he cited Maryland Code (1984, 1999 Repl. Vol), § 5–526(c) of the Family Law Article, which provided:

(c) *Compliance with licensing laws*—The Department, or the Department's designee, may not place a child in a residential group home or other facility that is not operating in compliance with applicable State licensing laws.

*Pendleton,* 398 Md. at 466, 921 A.2d at 207.

We held that the statute did not create a duty to individual children. Rather, we explained:

Child welfare services pursuant to statute are services to the general public. The State, by creating a program of such services, available to the general public, does not create a special relationship to any particular individual. Generally, without factual allegations of some other affirmative act beyond that required under the general program, no

---

515–19, 584 A.2d at 160–63. The court emphasized that neither the State nor the County "owe any individual duty of care merely by the enactment of a general ordinance requiring safety inspections, nor by the fact that it undertook inspections for safety violations." *Willow Tree,* 85 Md.App. at 515, 584 A.2d at 160–61. In *Pulliam v. Motor Vehicle Administration,* 181 Md.App. 144, 955 A.2d 843 (2008), a licensed driver with a history of seizures and accidents struck a car, killing plaintiff's husband and two children. The plaintiff alleged negligence on behalf of the Maryland Motor Vehicle Administration (MVA) based on its statutory authority to suspend or revoke the licenses of unsafe drivers. *Pulliam,* 181 Md.App. at 151, 955 A.2d at 847. The Court ruled that "the state cannot be held liable in tort for its failure to follow a mandatory statute pertaining to the issuance of drivers' licenses" because the statutory scheme was designed to protect the general public, and in accordance with *Pendleton* and *Ashburn,* "in order to use a statutory duty as the foundation for a negligence claim, the statute must set forth mandatory acts clearly for the protection of a *particular* class of persons rather than the public as a whole." *Pulliam,* 181 Md.App. at 186, 955 A.2d at 868 (internal quotation omitted). Therefore, the court ruled that the MVA had no duty to the individual plaintiff to ensure that the driver was capable of operating a car safely.

common law special relationship to any specific individual normally will result. As we said in *Muthukumarana* "[t]o find otherwise, by equating a duty to act with the provision of a general public service, might jeopardize the availability of those services in the first instance."

*Pendleton,* 398 Md. at 487–88, 921 A.2d at 220–21 (citations omitted). Further, the plaintiff did not allege that the State was negligent in licensing or monitoring the group home, and therefore, there were "no well-pled factual allegations that the State failed to comply with a specific statutory requirement." *Pendleton,* 398 Md. at 470, 921 A.2d at 210.[6]

In *Ashburn v. Anne Arundel County,* 306 Md. 617, 510 A.2d 1078 (1986), we rejected the contention that a provision in the Transportation Article, which set forth procedures for officers encountering intoxicated drivers, created a duty to a pedestrian who was injured by a drunk driver after an officer detected the driver's condition but failed to prevent him from operating the vehicle after the encounter. We emphasized that, generally, an officer owes no duty in tort to an individual victim because "the 'duty' owed by the police by virtue of their positions as officers is a duty to protect the public, and the breach of that duty is most properly actionable by the public in the form of criminal prosecution or administrative disposition." *Ashburn,* 306 Md. at 628, 510 A.2d at 1084 (citations omitted). We reiterated that in order for a statute to create a duty in tort it "must set forth mandatory acts clearly for the protection of a *particular class* of persons rather than the public as a whole." *Ashburn,* 306 Md. at 635, 510 A.2d at 1087 (emphasis in original) (internal quotation omitted); *see Muthukumarana,* 370 Md. at 499–500, 805 A.2d at 403 (noting that any statutory duty imposed on 911 telephone operators

---

6. It was also clear that there was no "special relationship" forged between the State and the appellant because there was no sufficient allegation that the State had any knowledge of the abusive propensity of the victim's roommate, nor was placing a child in foster care "an affirmative act sufficient to create a special relationship." *Pendleton,* 398 Md. at 484–87, 921 A.2d at 218–220.

was a duty to the public at large and did not allow for suit by an individual claimant).

In light of the foregoing precedents, we now turn to the federal statute at issue in the instant case, interpreting it according to generally accepted rules of statutory construction. As we said in *Turner v. Kight,* 406 Md. 167, 957 A.2d 984 (2008):

The rules governing the construction of Federal statutes are well-established. The preeminent canon requires the court to "presume that [the] legislature says in a statute what it means and means in a statute what it says there." *BedRoc Ltd., LLC v. U.S.,* 541 U.S. 176, 183, 124 S.Ct. 1587, 1593, 158 L.Ed.2d 338, 345 (2004), quoting from *Conn. Nat'l Bank v. Germain,* 503 U.S. 249 [253–54], 112 S.Ct. 1146 [1149], 117 L.Ed.2d 391 [397 (1992)]. If "the intent of Congress is clear and unambiguously expressed by the statutory language at issue, that would be the end of our analysis." *Zuni Public School Dist. No. 89 v. Department of Educ.,* 550 U.S. 81, 127 S.Ct. 1534, 1543, 167 L.Ed.2d 449, 461 (2007); *CSX Transp., Inc. v. Georgia State Bd. of Equalization,* [552] U.S. [9], [20], 128 S.Ct. 467, 474, 169 L.Ed.2d 418, 429 (2007). On the other hand, the interpretation of a word or phrase as used in a statute is not always governed by a dictionary definition of the word in isolation, but "depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." *Dolan v. U.S. Postal Service,* 546 U.S. 481, 486, 126 S.Ct. 1252, 1257, 163 L.Ed.2d 1079, 1087–88 (2006). Extrinsic materials, such as legislative history, "have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms." *Exxon Mobil Corp. v. Allapattah Services, Inc., supra,* 545 U.S. [546] at 568, 125 S.Ct. [2611] at 2626, 162 L.Ed.2d [502] at 526–27 [(2005)]. We have applied these same principles in construing Maryland statutes. *See Comptroller v. Science Applications,* 405 Md. 185, 198, 950 A.2d 766, 773 (2008)[; *Dept. of Assess. & Tax. v.*

*Nat. Bank,* 310 Md. 664, 670, 531 A.2d 294, 297 (1987) ("The rules of statutory construction applied by the Supreme Court to federal statutes are not significantly different from those which we apply.").]

*Turner,* 406 Md. at 175–76, 957 A.2d at 988–89; *see Sweeney v. Savings First Mortgage, LLC,* 388 Md. 319, 327, 879 A.2d 1037, 1041 (2005) ("In interpreting federal statutory law, a court may look beyond the plain language of a statute when: 1) Congress has expressed a clear intent contrary to the statutory text; 2) literal application would frustrate the purpose of the statute; or 3) literal application would 'produce an absurd result.'" (citing *Holland v. Big River Minerals Corp.,* 181 F.3d 597, 603 n. 2 (4th Cir.1999))); *see also Shaw v. Governing Board of Modesto City School Dist.,* 310 F.Supp. 1282, 1285 (E.D.Cal.1970) (examining a provision in the NSLA "based upon the plain meaning of the statutory language").

The National School Lunch Act, originally enacted in 1946, created the National School Lunch Program, a federal program aimed at providing free or low-cost nutritious meals to the nation's school children. The introductory language of the statute reads:

It is declared to be the policy of Congress, as a measure of national security, to safeguard the health and well-being of the Nation's children and to encourage the domestic consumption of nutritious agricultural commodities and other food, by assisting the States, through grants-in-aid and other means, in providing an adequate supply of foods and other facilities for the establishment, maintenance, operation, and expansion of nonprofit school lunch programs.

42 U.S.C. § 1751 (2006). This opening declaration of policy makes clear that the NSLA was not designed to protect a particular subset of students, such as those with food allergies, but rather, to serve the needs of all eligible school-aged children. *See Davis v. Robinson,* 346 F.Supp. 847, 857 (D.R.I. 1972) (noting that the aim of the 1970 amendments to the NSLA, "repeated over and over again in the Congressional history, is to combat hunger in the classroom and malnutri-

tion."); Patrick E. Clancy & Wendy L. Wyse, Comment, *Feeding the Hungry*, 5 Harv. C.R.-C.L. L.Rev.440, 443 (1970) ("[The NSLA] authorizes federal funds to be spent by states for the provision of lunch for all students.. . ."); Note, *The National School Lunch Program, 1970: Mandate to Feed the Children*, 60 Geo. L.J. 711, 714 (1972) ("The original proponents of the [NSLA] were particularly concerned with the welfare of those children who, if left to their own resources, never would be able to afford a nutritious lunch."). Respondents emphasized in their brief that, "the beneficiaries of this statutory goal are not limited to food allergic students, but students in general, as well as their parents and, as the congressional policy makes clear, the nation as a whole." Petitioner herself acknowledges, that "[t]he legislative history of the National School Lunch Act demonstrates beyond reasonable question that . . . the larger policy goal was to provide for the general nutritional welfare of America's school age children," but, nonetheless, argues that the law imposes a mandatory duty on the State defendants to "safeguard" the nutritional needs of students with food allergies.

Before this Court,[7] Petitioner cites to several sections of the NSLA and its regulations which, in her view, create a duty owed by the State defendants to children with food allergies to ensure that they are served school lunches that meet their individual dietary needs.[8] It is clear to us, however, that

---

7. Petitioner cites several regulatory provisions on appeal that were included in her response to the motion to dismiss, but were not included within the complaint. *See Hansen v. City of Laurel*, 420 Md. 670, 696 n. 16, 25 A.3d 122, 139 n. 16 (2011) ("An opposition to a motion to dismiss is not a pleading."). This notwithstanding, we address these provisions to make clear that they, also, do not support Petitioner's claim that the federal law imposes a duty upon the State defendants to offer special protection to children with food allergies.

8. Although not specifically included in her brief or petition for certiorari, Petitioner referenced 42 U.S.C. § 1758(a) (2006) during oral argument (and in the intermediate appellate and trial courts) as establishing a duty owed by the State defendants. That section reads:

§ 1758. Program requirements
(a) Nutritional requirements

Petitioner failed to allege a statutory duty "with certainty and definiteness" sufficient to support her cause of action. *Horridge*, 382 Md. at 182, 854 A.2d at 1238 (quotation omitted).

Petitioner first cites 7 C.F.R. § 210.3(b) (2006), which reads in pertinent part:

(b) *States.* Within the States, the responsibility for the administration of the Program in schools, as defined in § 210.2, shall be in the State educational agency.... Each State agency desiring to administer the Program shall enter into a written agreement with the Department for the administration of the Program in accordance with the applicable requirements of this part; part 235; part 245; parts 15, 15a, and 15b, and 3015 of Department regulations; and FNS instructions.

From this section Petitioner claims "the State's obligation to every school age child is patent." What is patent, however, from this provision is only that the State oversees the administration of the program in the local schools pursuant to an agreement with the Department of Agriculture. Indeed, the NSLA is administered federally by the U.S. Department of Agriculture's Food and Nutrition Service, which provides funding and commodities to the states, which in turn disburse the items to participating local school boards. *See* 42 U.S.C. § 1756–1757 (2006). The Maryland Department of Education (MSDE) administers the program state-wide, COMAR

(1) (A) Lunches served by schools participating in the school lunch program under this chapter [42 U.S.C. §§ 1751–1769] shall meet minimum nutritional requirements prescribed by the Secretary on the basis of tested nutritional research, except that the minimum nutritional requirements—

    (i) shall not be construed to prohibit the substitution of foods to accommodate the medical or other special dietary needs of individual students; and

    (ii) shall, at a minimum, be based on the weekly average of the nutrient content of school lunches.

As the intermediate appellate court noted in the present case, although this section references special dietary needs, "it does not mandate that the State take any particular action to ensure that a child such as Liana is never fed any food containing peanuts." *Pace*, 195 Md.App. at 43, 5 A.3d at 1127. We agree with that analysis.

13A.06.01.01(A)(1), by disbursing federal subsidies to participating school districts, 42 U.S.C. § 1757(a) (2006), and overseeing the program through audits and inspections to ensure compliance with federal eligibility and nutritional requirements. *See* 7 C.F.R. § 210.18. The provision Petitioner cites merely reflects the logistics of the federal program, and does not refer to any duty towards children with special dietary needs.

Petitioner next cites 7 C.F.R. § 210.23 (2006) as demonstrating a "specific duty owed by the State to each individual student under the [P]rogram." That provision states:

> (b) *Civil rights.* In the operation of the Program, no child shall be denied benefits or be otherwise discriminated against because of race, color, national origin, age, sex or disability. State agencies and school food authorities shall comply with the requirements of: Title VI of the Civil Rights Act of 1964; [T]itle IX of the Education Amendments of 1972; section 504 of the Rehabilitation Act of 1973; the Age Discrimination Act of 1975; Department of Agriculture regulations on nondiscrimination (7 C.F.R. parts 15, 15a, and 15b); and FNS Instruction 113–6.

This provision only requires that lunches be made available to all eligible children, regardless of certain immutable characteristics, and does not refer to food allergies. The only portion of the NSLA Petitioner presents which, in fact, mentions anything about special dietary needs is 7 C.F.R. § 210.10(g)(1) (2006). This regulation is entitled: "Nutrition standards and menu planning approaches for lunches and requirements for afterschool snacks," and subsection (g) answers the question: "What exceptions and variations are allowed in meals?" It states:

> (1) *Exceptions for medical or special dietary needs.* Schools must make substitutions in lunches and afterschool snacks for students who are considered to have a disability under 7 C.F.R. part 15b and whose disability restricts their diet. Schools may also make substitutions for students who do not have a disability but who cannot consume the regular lunch or afterschool snack because of medical or other

special dietary needs. Substitutions must be made on a case by case basis only when supported by a statement of the need for substitutions that includes recommended alternate foods, unless otherwise exempted by FNS. Such statement must, in the case of a student with a disability, be signed by a physician or, in the case of a student who is not disabled, by a recognized medical authority.

7 C.F.R. § 210.10(g)(1) (2006). This language, Petitioner contends, creates a duty for the State to "set policy for schools relating to the individual dietary needs of every student eating lunch at school." She asserts that "the purpose of the plain language of the controlling regulations is transparent: the reason special provision is made for students with disabilities is not only to accommodate those disabilities, but to protect children who are disabled and/or have "special dietary needs." On the contrary, this section is insufficient to create a statutory duty to children with special dietary needs for two reasons. First, the plain language makes clear that the entire subsection applies to the local schools, not the states, as these two entities have differing responsibilities under the NSLA and are defined differently under the statute. *See* 7 C.F.R. § 210.2 (2006). Second, it is clear that the language is permissive rather than mandatory, such that schools *may* provide substitutions for non-disabled children who have special dietary needs, but need not do so. 7 C.F.R. § 210.10(g)(1) (2006).[9] In other words, contrary to Petitioner's argument, substitutions made for non-disabled students under this section are, in fact, only discretionary accommodations. We

---

9. As Respondents point out, recent commentary to 7 C.F.R. § 210.10 sheds light on the meaning of the largely unchanged terms by stating that 7 C.F.R. § 210.10(g) "require[s] school food authorities (SFAs) to make food substitutions for children whose disabilities restrict their diet and give[s] school food authorities *discretion* to make food substitutions for students with medical or other special dietary needs which do not constitute disabilities." Fluid Milk Substitutions in the School Nutrition Programs, 73 Fed.Reg. 52903 (Sept. 12, 2008) (emphasis added). Ms. Pace concedes that peanut allergies have not been held to constitute a disability, *see Land v. Baptist Medical Center,* 164 F.3d 423 (8th Cir.1999), and thus it is clear that any accommodation a school gives to such students is discretionary.

agree with the analysis of the intermediate appellate court; Petitioner has not persuaded us that these provisions "impose a duty upon the State defendants that would make them liable for failing to ensure that no cafeteria worker ever fed peanut butter to a child who is allergic to peanuts." *Pace*, 195 Md.App. at 45, 5 A.3d at 1128.

Petitioner next points to 7 C.F.R. § 210.18(g)(2), and argues that the regulation makes the State "the sole party ... charged with the responsibility of ensuring that the work of protecting children against incidental, harmful exposure to food stuffs is delivered with requisite care...." She interprets the oversight provision as "provid[ing] for administrative review, imposing specific 'hands on' operational monitoring requirements upon the State," and thereby, establishing a duty owed to food-allergic children, which "literally jumps off the page." The relevant language from which Petitioner gleans this interpretation is:

(g) *Critical areas of review.* The performance standards listed in this paragraph are deemed critical since compliance in these areas is directly linked to the service of a reimbursable lunch.

\*　　\*　　\*

(2) For each school reviewed, the State agency must:

(i) For the day of the review, observe the serving line(s) to determine whether all required meal elements (food items/components, menus items or other items, as applicable) as required under § 210.10 are offered.

7 C.F.R. § 210.18(g)(2) (2006). Petitioner asserts that this regulation demonstrates that the Maryland State Department of Education must "have direct operational oversight and 'food component' control ... visit schools, [and] actively observ[e] the serving lines in school cafeterias." Additionally, she argues that "[T]he purpose of the [S]tate's oversight role under § 210.18(g)(2) is specific to ensuring that the protection offered to the protected class of students is *delivered* to that protected class." (emphasis by Petitioner). By referencing "protection" to a "protected class" we assume Petitioner

means to allege that, pursuant to this regulation, the State defendants must ensure the lunchtime nutritional safety of students with food allergies. As Respondents argue, "[t]he Paces presumably see this [review] as the State's opportunity to ensure that the local school cafeteria personnel provide substituted foods for children with food allergies." There is nothing, however, in the plain language of this subsection which would impose a duty on the State to protect children with allergies from the foods that plague them.[10] Further, any such assertion that the State does, in fact, have this duty, is belied by the fact that the regulation requires the State to engage in review only once every five-year period. 7 C.F.R. § 210.18(c)(1) (2006). This is hardly indicative of a Congressional intent that the State monitor the day-to-day placement of potential allergens on serving lines, develop a flagging regimen for allergic students, or otherwise take responsibility for the food sensitivities of particular children. Rather, it seems clear to us that the section makes provision for audits every five-years in order to ensure a school's compliance with federal meal service standards under the NSLA.

We agree with the intermediate appellate court's determination that "the statutes and regulations upon which [Petitioner] base[s] [her] claim of special duty are simply not phrased with the sort of specificity that supports the imposition of liability upon the State." *Pace*, 195 Md.App. at 49, 5 A.3d at 1131; *c.f. Horridge*, 382 Md. at 189, 193, 854 A.2d at 1245 (holding that the statute at issue made "abundantly clear as to be beyond cavil" the legislature's intent to place "specific and focused" obligations on the State to protect an identified subset of children); *see Remsburg*, 376 Md. at 584, 831 A.2d at 27 ("Evidence of negligence may be established by the breach of a statutory duty when the plaintiff is a member of the class of persons the statute was designed to protect and the injury was of the type the statute was designed to prevent." (internal

---

**10.** It is worth noting that, under 7 C.F.R. § 210.10(k)(3)(ii) (2006) "nuts and seeds and their butters" may be served to children as "meat alternatives" under the Program.

quotation omitted)). Accordingly, Petitioner could not "identify the specific words and phrases in the NSLA that ... obligated the State defendants to take some specific action that would have prevented Liana being fed a peanut butter sandwich by local school personnel."[11] *Pace*, 195 Md.App. at 49, 5 A.3d at 1131. Instead, any duty placed on the State defendants by the statute "redounded to the general public," *Pulliam*, 181 Md.App. at 187, 955 A.2d at 868, and invokes our application of the public duty doctrine. Therefore, Petitioner's claim cannot be sustained as a matter of law. The NSLA does not impose a statutory duty on the State defendants to identify students with special dietary needs, develop a flagging regimen, or otherwise guard against individual exposure to food allergens. In the absence of a statutory duty "to exercise a greater degree of care for students with food allergies than the general level of care for health and safety the State defendants exercise for all students in public schools," *Pace*, 195 Md.App. at 52, 5 A.3d at 1132, Petitioner may not maintain a suit in negligence, and, therefore, the complaint was properly dismissed.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.**

---

11. After conducting our own research, our conclusion is the same as that of the intermediate appellate court, as we also "have been unable to find any reported case anywhere in the country in which a student has sued a state for monetary damages to compensate for a food-related injury that was allegedly caused by a violation of either the NSLA or regulations adopted pursuant to that statute." *Pace*, 195 Md.App. at 45 & n. 1, 5 A.3d at 1128 & n. 1.